United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

———————

No. 96-2120

———————

| | | |
|---|---|---|
| Ben Oehrleins and Sons and | * | |
| Daughter, Inc.; Elk River | * | |
| Landfill, Inc.; Gallagher's | * | |
| Service, Inc.; Knutson Services, | * | |
| Inc.; Randy's Sanitation, Inc.; | * | |
| Poor Richard's, Inc.; Vasko | * | |
| Rubbish Removal, Inc.; Wasteco, | * | |
| Inc.; Waste Systems Corp.; | * | |
| Walter's Recycling & Refuse | * | |
| Service, | * | |
| | * | |
| Appellees, | * | Appeals from the United States |
| | * | District Court for the District |
| v. | * | of Minnesota. |
| | * | |
| Hennepin County, | * | |
| | * | |
| Appellant. | * | |
| | * | |
| | * | |
| | * | |
| State of Minnesota, by its | * | |
| Attorney General and its Office | * | |
| of Environmental Assistance; Ogden | * | |
| Products, Inc., | * | |
| | * | |
| Amici Curiae. | * | |

———————

_____

No. 96-2170

_____

Robinson Rubber Products, Co.,                    *
Inc.; Dean M. Akins; Patrick                      *
Schoenecker; Brad Robinson,                       *
Individually and on behalf of                     *
all other persons similarly                       *
situated,                                         *
                                                  *
              Appellees,                          *
                                                  *
       v.                                         *
                                                  *
Hennepin County,                                  *
                                                  *
              Appellant.                          *
_____                                       *
                                                  *
State of Minnesota, by its                        *
Attorney General and its Office                   *
of Environmental Assistance; Ogden                *
Products, Inc.,                                   *
                                                  *
              Amici Curiae.                        *

_____

Submitted:  March 12, 1997

Filed:  June 9, 1997

_____

-2-

Before WOLLMAN and BEAM, Circuit Judges, and LAUGHREY,[1] District Judge.
_____

BEAM, Circuit Judge.

This case involves the authority of a local government to regulate the flow and disposal of solid waste. Hennepin County, Minnesota, enacted a "flow control" regulation ("Ordinance 12") that required most County waste to be delivered to County-designated transfer stations or processing facilities. The County later suspended enforcement of Ordinance 12 with respect to waste destined for disposal outside of Minnesota, but continued to require all waste remaining in the state to go to the designated facilities. Local and out-of-state waste haulers, landfills, and residential and commercial waste generators brought suit, alleging that Ordinance 12 violates the Commerce Clause of the United States Constitution.

After finding that both sets of plaintiffs have standing, the district court concluded that Ordinance 12, both as written and as currently enforced, discriminates against interstate commerce and permanently enjoined its enforcement. We hold that the "waste generator" plaintiffs--that is, customers of waste haulers--do not have standing. With respect to the merits, we agree that those provisions of Ordinance 12 that prevent the delivery of County waste to out-of-state processors are unconstitutional. We conclude, however, that as applied solely to intrastate waste disposal, Ordinance 12 does not discriminate against interstate commerce, and reverse and remand that portion of the district court decision.

_____

[1]The Honorable Nanette K. Laughrey, United States District Judge for the Eastern and Western Districts of Missouri, sitting by designation.

## I. BACKGROUND

Over the past twenty years or so, state and local governments have frequently faced the problem of how, within permissible constitutional boundaries, to regulate the flow and disposal of solid waste. As the Supreme Court recently noted, "[a]s solid waste output continues apace and landfill capacity becomes more costly and scarce, state and local governments are expending significant resources to develop trash control systems that are efficient, lawful, and protective of the environment." C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 385-86 (1994).[2]

One of Minnesota's efforts in this regard is the Minnesota Waste Management Act of 1980. The Act was intended to protect the state's environment and the public health by reducing the amount of waste generated and disposed of, improving energy recovery from waste, coordinating waste management among political subdivisions, and developing waste facilities. Minn. Stat. § 115A.02(a). The Act sought to create an "integrated waste management system" in Minnesota, with a hierarchy of preferences for various waste management practices. In order of preference, the Act

---

[2]The Supreme Court has considered constitutional challenges to such regulatory efforts five times. See Carbone, 511 U.S. 383; Oregon Waste Sys., Inc. v. Department of Envtl. Quality, 511 U.S. 93 (1994); Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Natural Resources, 504 U.S. 353 (1992); Chemical Waste Management, Inc. v. Hunt, 504 U.S. 334 (1992); Philadelphia v. New Jersey, 437 U.S. 617 (1978). There have been many other challenges in the Courts of Appeal. See, e.g, SDDS, Inc. v. South Dakota, 47 F.3d 263 (8th Cir. 1995); Waste Sys. Corp. v. County of Martin, 985 F.2d 1381 (8th Cir. 1993); Southeast Arkansas Landfill, Inc. v. State of Arkansas, Dep't of Pollution Control and Ecology (In re Southeast Arkansas Landfill, Inc.), 981 F.2d 372 (8th Cir. 1992). See generally, John Turner, The Flow Control of Solid Waste and the Commerce Clause: *Carbone* and its Progeny, 7 Vill. Envtl. L. J. 203 (1996); Sidney M. Wolf, The Solid Waste Crisis: Flow Control and the Commerce Clause, 39 S.D. L. Rev. 529 (1994).

addresses waste reduction and reuse, recycling, composting, resource recovery, and land disposal. Id. at § 115A.02(b).

To meet these goals, the Act requires counties to implement plans for local waste management. Id. at § 115A.46. In adopting these plans, counties must consult with persons providing waste collection, processing, and disposal services, and must submit proposed plans to the state's Office of Environmental Assistance for approval. Id. at § 115A.46, Subd. 1(d) & (e). The Act also allows counties to develop designation plans which require all or part of county waste to be delivered to one or more county-designated transfer or disposal facilities. Id. at §§ 115A.80 - 115A.85. Certain counties must seek approval for waste management plans and designation plans from the Metropolitan Council, a planning and development agency created by the state legislature for the seven-county Minneapolis-St. Paul metropolitan area. Id. at § 473.803, Subd. 1.

In accordance with the Act, Hennepin County (which includes Minneapolis) created a waste management master plan in 1981. In April 1985, the County obtained approval from the Metropolitan Council for a designation plan to supplement its master plan. The County determined that in order to reduce the amount of County waste disposed of in landfills, it would concentrate the disposal of County waste in "waste-to-energy" processing facilities. Central to this goal was the construction of a state-of-the-art incinerator in Minneapolis that would convert certain solid waste into electricity. In order to finance the construction of the facility, the County issued approximately $150,000,000 in bonds. The resulting facility, the Hennepin Energy Resource Corp. ("HERC"), while constructed with public funds, is owned and operated by two out-of-state corporations.

In order to implement its designation plan, the County adopted Ordinance 12 in December of 1985. The Ordinance, which took effect June 1, 1989, was intended in part to provide "assurance that sufficient quantities of designated waste will be

delivered to the [HERC] Facility."[3]  Hennepin County Board Resolution No.85-12-0823-R1, reprinted in Appellant's App. at 23.  To provide this assurance, the Ordinance requires that all "designated waste," which includes most forms of non-hazardous commercial and residential solid waste, be delivered only to County-designated transfer stations or processing facilities.  The Ordinance itself originally designated certain interim transfer stations and one processing facility: the HERC incinerator.  Currently, HERC and one other privately owned waste-to-energy facility located outside Minneapolis are the only designated processing facilities.  There are currently eight designated transfer stations, which receive the bulk of the solid waste that supplies the HERC facility.

The Ordinance provides that the County can designate additional facilities.  The Ordinance also exempts from the designation requirement any waste processed at facilities already in existence at the time the Metropolitan Council approved the designation plan in 1985.  As required by the Waste Management Act, Minn. Stat. § 115A.893, the Ordinance provides that non-designated facilities may petition the County for exclusion of some waste from designation.  The County maintains that it has granted several such exclusions, including one to plaintiff Knutson Services, Inc.  Haulers who deliver designated waste to non-designated facilities are subject to penalties, including misdemeanor charges, fines, costs and special assessments, injunction, and the suspension or revocation of their hauling license.  The County has actively monitored haulers and has imposed penalties on companies found to have violated the Ordinance.

---

[3]Ordinance 12 lists other goals in its preamble, including the reduction of the volume of County waste deposited in landfills, the recovery of materials and energy from solid waste, the conservation of resources, and the furtherance of waste management policies.

In 1993, the County Board passed a resolution to cease enforcement efforts against haulers who delivered designated waste to facilities outside the state. Pursuant to this resolution, the County notified waste haulers that it had "suspended, until further notice, enforcement actions relating to Hennepin County generated waste destined for disposal outside the State of Minnesota." Appellant's App. at 156 (emphasis in original). The County acknowledges, however, that it has continued to enforce the Ordinance with respect to waste delivered to non-designated facilities within Minnesota.

In 1994, the Oehrleins plaintiffs filed suit in the district court. Plaintiffs in the Oehrleins case are eight Minnesota waste haulers, one Minnesota landfill, and one Iowa landfill. The Robinson Rubber plaintiffs, who filed suit in 1995, are a certified class of residential and commercial "waste generators" in Hennepin County who paid for waste removal between June 1, 1989, and the present. Both the Robinson Rubber and Oehrleins plaintiffs alleged that Ordinance 12 violates the Commerce Clause of the United States Constitution. They requested an injunction against enforcement of the Ordinance and damages under 42 U.S.C. § 1983.[4]

The district court concluded that Ordinance 12, both as written and as enforced after the 1993 "suspension," discriminates against interstate commerce, and so violates the Commerce Clause. The district court granted summary judgment to both sets of plaintiffs. Ben Oehrleins and Sons and Daughter, Inc. v. Hennepin County, 922 F. Supp. 1396, 1405 (D. Minn. 1996); Robinson Rubber Prods. Co. v. Hennepin County, No. 4-95-220, Slip op. at 36-37 (D. Minn. March 29, 1996). In this consolidated appeal, the County argues that the Tax Injunction Act, 28 U.S.C. § 1341, deprives the

---

[4]Plaintiffs also alleged that the County's enforcement of the Ordinance violates their right to substantive due process and violates federal antitrust laws. These claims are not at issue in this appeal.

federal courts of jurisdiction to enjoin Ordinance 12, that all plaintiffs lack standing, and that the Ordinance does not violate the Commerce Clause.

## II.    DISCUSSION

### A.    Standing

The County maintains that both the hauler/landfill plaintiffs and the waste generator plaintiffs lack standing to bring this action. The district court found that both sets of plaintiffs have standing.

Standing is the constitutional requirement, imposed by the "cases or controversies" provision of Article III, that a plaintiff must allege a judicially cognizable and redressable injury in order to pursue a lawsuit. Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-60 (1992). To establish standing, a plaintiff must demonstrate three minimal constitutional requirements: (1) an "injury in fact" that is both (a) concrete and particularized, and (b) actual or imminent, rather than conjectural or hypothetical; (2) a causal connection between the alleged injury and the defendant's conduct; that is, that the injury is "fairly traceable" to the challenged action; and (3) that it is likely that a favorable decision will redress the injury. Id. at 560-61.

Even if a plaintiff meets the minimal constitutional requirements for standing, there are prudential limits on a court's exercise of jurisdiction. These prudential limits are judicially imposed and "are 'founded in concern about the proper--and properly limited--role of the courts in a democratic society.'" Bennett v. Spear, 117 S. Ct. 1154, 1161 (1997) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)). Two prudential limits are relevant to this case. First, only in exceptional cases may a party have standing to assert the rights of another. Warth, 422 U.S. at 499. This "third-party standing" rule thus "normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves." Id. at 509. In addition,

plaintiffs alleging a violation of a constitutional or statutory right must demonstrate that they are within the "zone of interests" of the particular provision invoked. Bennett, 117 S. Ct. at 1161. To satisfy this prudential requirement, a plaintiff must show that "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Association of Data Processing Serv. Orgs. v. Camp, 397 U.S. 150, 153 (1970); see also Bennett, 116 S. Ct. at 1161.

There is no question that the Oehrleins plaintiffs, that is, various waste haulers and processors, have standing. Ordinance 12 prohibits haulers from delivering designated waste to non-designated facilities. Haulers who violate the Ordinance are subject to a wide variety of sanctions. The record is undisputed that the County has, in fact, subjected various haulers, including some of the hauler plaintiffs, to such penalties. Haulers subject to the Ordinance thus have suffered an actual or imminent injury in fact. Furthermore, the Ordinance harms processors such as the landfill plaintiffs who wish to participate in the market for Hennepin County waste by prohibiting access to that waste. The processor plaintiffs have therefore also alleged a sufficient injury in fact. These injuries are directly traceable to the County's enactment and enforcement of Ordinance 12, and a decision holding the Ordinance unconstitutional would redress those injuries, both by clearing the way for recovery of damages and by enjoining further enforcement. Finally, we see no prudential barriers to standing for the Oehrleins plaintiffs.

The class of generator plaintiffs represented by Robinson Rubber presents a more difficult question. The injury these plaintiffs allege is, essentially, that they have been forced to pay higher fees for waste collection, because haulers have passed on to them HERC's high fees.[5] Insofar as the generator plaintiffs seek relief for the passed-

---

[5]The County's original tipping fee at interim facilities, before the HERC plant began operating, was $75 per ton. The County raised the rate to $95 per ton in 1990. In contrast, an October 1990 report by the Metropolitan Council indicates that tipping

on costs of the County's higher disposal fees, their alleged injury is the indirect result of the County's regulation of the haulers.[6] "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." Lujan, 504 U.S. at 562 (citations omitted).

We conclude nonetheless that this indirect economic injury constitutes an injury in fact. Faced with high tipping fees at the HERC incinerator, and prevented from seeking more competitive rates elsewhere, haulers responded, naturally enough, by charging their customers more. This economic burden on customers is concrete, particularized, and actual, and is in no way hypothetical or conjectural. Cf. Waste Sys. Corp. v. County of Martin, 985 F.2d 1381, 1387 (8th Cir. 1993) (financial burden from flow control ordinance rests in part on waste generators). This burden may be indirect, but it is neither speculative nor merely incidental.

Furthermore, there is little question that these rate increases are fairly traceable to Ordinance 12's restrictions on waste haulers. The County does not dispute that haulers pay significantly higher tipping fees under the designation plan than they would

---

fees at regional landfills ranged from $25 to $60 per ton during fiscal year 1990. Tipping fees at metropolitan landfills averaged $52.60 per ton, while fees at non-metropolitan landfills averaged $40 per ton. In 1994, the County reduced tipping fees at designated facilities to $60 per ton, but also enacted a surcharge on County waste.

[6]The generators argue that Ordinance 12 directly regulates them because "persons" subject to penalty for disposal of designated waste in non-designated facilities include "an individual, business, . . . [or] generator." Appellant's Appendix at 141 (emphasis added). The generator plaintiffs did not allege in their complaint, however, that they have been directly harmed by enforcement of the Ordinance against them. Their sole allegation of injury and claim for relief is that they have incurred increased costs because of enforcement of the designation requirements against haulers.

pay at otherwise available landfills. Indeed, the County fully anticipated that designation would result in consumers paying higher disposal fees.[7] Finally, the generators' injuries can be effectively redressed by the remedies they seek: damages for the allegedly unconstitutional restrictions and injunction of continued enforcement. We thus hold that the generator plaintiffs satisfy Article III's "irreducible constitutional minimum" requisites for standing. Lujan, 504 U.S. at 560.

Whether the generator plaintiffs can satisfy prudential limitations on standing is a different question. We are aware of no Commerce Clause case in which the court has granted standing to a plaintiff who was a consumer whose alleged harm was the passed-on cost incurred by the directly regulated party. Indeed, while we continue to use the parties' shorthand term "waste generators" for the Robinson Rubber plaintiffs, this term somewhat confuses these plaintiffs' actual role: they are consumers of waste disposal services supplied by garbage haulers such as some of the Oehrleins plaintiffs. This kind of "consumer standing" in Commerce Clause cases has not been squarely considered by the Supreme Court.

The generator plaintiffs rely in part on the Supreme Court's recent opinion in General Motors Corp. v. Tracy, 117 S. Ct. 811 (1997). In Tracy, Ohio imposed sales and use taxes on purchases of natural gas from all entities, whether in-state or out-of-state. However, the state exempted from taxation gas purchased from sources that met a statutory definition of "natural gas companies." The definition of "natural gas companies," however, was effectively limited to in-state entities. As a result, the taxes were imposed only on gas purchased directly from out-of-state companies. Id. at 816.

---

[7]The designation plan the County submitted to the Metropolitan Council stated that "tipping fees would have to be passed on by haulers to their customers. . . . [T]ipping fees [at designated facilities] will probably still be higher than fees for disposal at existing landfills. This will result in haulers having to charge higher rates for customers within Hennepin County than they would charge to similar customers in neighboring counties." Reprinted in Appellant's App. at 206.

General Motors, which purchased nearly all of its natural gas from out-of-state suppliers, brought suit, claiming that the tax was discriminatory and thus violated the Commerce Clause.

The Court held that General Motors had standing, even though it was an in-state firm and the discrimination of which it complained was based on the out-of-state situs of its suppliers. Id. at 818. The Court relied in part on its decision in Bacchus Imports v. Dias, 468 U.S. 263 (1984). In Bacchus Imports, in-state liquor wholesalers had standing to challenge a discriminatory tax on imported liquor; much as in Tracy, the discrimination was based not on the plaintiff's status, but on where the purchased goods originated. Id. at 267.

The Court's recent decision in Camps Newfound/Owatonna, Inc. v. Town of Harrison, No. 94-1988, 1997 WL 255351 (U.S. May 19, 1997), while not directly addressing standing, presents a similar scenario. In Camps, the Court considered a Maine tax statute that exempted charitable institutions from real estate and property taxes. Under the statute, however, charities that principally benefited nonresidents of the state were entitled to only a limited tax exemption. The plaintiff, a nonprofit corporation, ran a youth camp in Maine. Ninety-five percent of the young people who visited the camp came from outside the state, rendering the camp ineligible for the full tax exemption. The Court held that the exemption facially discriminated against interstate commerce because it "expressly distinguishes between entities that serve a principally interstate clientele and those that primarily serve an intrastate market." Id. at *7.

These cases, however, do not stand for the proposition that consumers paying the end-line cost of an economic regulation have standing to challenge the regulation under the Commerce Clause. In Tracy, Bacchus Imports, and Camps, the plaintiffs were not alleging that they incurred a passed-on cost; rather, the plaintiffs--not the out-of-state entities--were directly assessed the challenged taxes. Furthermore, the

plaintiffs in those cases were, in fact, directly subject to discrimination: they were liable for taxes based on where they purchased goods or (in the case of Camps) the nonresident status of their customers. The plaintiffs' Commerce Clause challenges sought to protect their own rights to purchase goods or do business across state borders, without being subject to a discriminatory tax.

The rights vindicated in Tracy, Bacchus Imports, and Camps are, in fact, comparable to the rights asserted by the hauler plaintiffs in this case. As in those cases, the hauler plaintiffs are directly subject to extra costs (as well as criminal charges, fines, and other penalties) based on where they choose to do business. The generator plaintiffs can claim no comparable injury. The injury the generator plaintiffs assert is, rather, comparable to GM truck purchasers claiming a Commerce Clause injury because they must pay more for vehicles because of GM's increased energy costs. Likewise, the comparable plaintiff in Bacchus Imports would be consumers disgruntled because they were required to pay more for imported liquor.[8]

In our view, the generator plaintiffs' claims fall within the third-party standing doctrine described in Warth. In Warth, a number of individuals and organizations challenged city zoning ordinances that allegedly barred private development of low income housing. One group of plaintiffs were city residents who alleged that they suffered "economic injury consequent to [the city's] allegedly discriminatory and exclusionary zoning practices." Warth, 422 U.S. at 508. The Court held that these plaintiffs' claims fell "squarely within the prudential standing rule that normally bars

---

[8]In this respect, Camps presents a slightly different situation. In that case, the consumers--that is, the campers--were themselves purchasing services across state borders, and coming into Maine temporarily in order to make use of those services. They were thus unlike the generator plaintiffs in this case, who are state residents dealing with in-state waste haulers.

litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves." Id. at 509.

The injury claimed by the generator plaintiffs is of the same sort: higher garbage bills due to the passed-on costs incurred by the haulers under the Ordinance. The generator plaintiffs' alleged injury is the economic consequence of the County's restriction of where haulers may deliver waste. The generator plaintiffs cannot claim any personal right under the Commerce Clause to lower garbage bills. Any relief due the generator plaintiffs turns on the rights of the haulers to be free of the Ordinance's designation requirements.

We hold, therefore, that the generator plaintiffs are seeking to assert the constitutional rights of the hauler plaintiffs, and the third-party standing doctrine applies. We do not see any reason to relax this prudential bar in this case. While the haulers and generators have an "incidental congruity of interest" in seeing the Ordinance invalidated, they have no special relationship that warrants allowing the generators to assert the rights of the haulers. Id. at 510. The generators' status as purchasers of disposal services does not constitute such a relationship. If such were the case, then end-line consumers could always assert the Commerce Clause claims of the businesses from whom they purchase goods or services. Furthermore, there is no indication that allowing standing to the generators "is necessary to insure protection of the rights asserted." Id. That the hauler plaintiffs brought suit more than a year before the generator plaintiffs (and indeed share the same counsel) and have aggressively litigated their own claims demonstrates that they are fully capable of asserting their own rights.

We also conclude that the generator plaintiffs lack standing because they are not within the "zone of interests" of the Commerce Clause. The zone of interests doctrine requires that "'the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional

-14-

guarantee in question.'" Bennett, 117 S. Ct. at 1161 (quoting Camp, 397 U.S. at 153). The Ninth Circuit recently held that individual waste generators lacked standing to bring a Commerce Clause challenge to a county ordinance that required residents to either contract with a designated trash hauler or to dispose of waste at certain designated facilities. Individuals for Responsible Gov't, Inc. v. Washoe County, 110 F.3d 699, 703-04 (9th Cir. 1997). The court in Washoe County held that the plaintiffs satisfied the constitutional minimal standing requirements, but that their asserted injury, having to pay for unwanted garbage services, was "not even marginally related to the purposes underlying the dormant Commerce Clause." Id. at 703.

Although the Washoe County ordinance differed somewhat from the regulation at issue in this case, the generator plaintiffs here are asserting a similar interest. We agree with the Ninth Circuit that this interest is not one protected by the Commerce Clause. The Commerce Clause is intended to prevent economic protectionism and retaliation between states and to allow markets to flourish across state borders, thus prohibiting "laws that would excite . . . jealousies and retaliatory measures" between states. Carbone, 511 U.S. at 390. The harm alleged by the generator plaintiffs is narrow, personal, and strictly local: residents of Hennepin County have to pay relatively high bills for the disposal of their garbage. It is unlikely that South Dakota or Iowa are much concerned with what these plaintiffs pay for trash service, much less that high garbage bills in Minneapolis are likely to cause "jealousies and retaliatory measures" in other states. Local consumers shouldering the end-line burden of a purely local regulation are not within the zone of interests of the Commerce Clause. Again, if the ultimate cost of economic regulation to consumers were within the zone of interests of the Commerce Clause, then every consumer could properly challenge such regulations. We decline to expand the scope of claims cognizable under the Commerce Clause this far.

Because we find that the plaintiff waste generators in the Robinson Rubber case are asserting the third-party rights of haulers to be free of regulation and because their

alleged injury is not within the zone of interests protected by the Commerce Clause, we hold that prudential considerations bar them from maintaining this action.[9]

**B.      Tax Injunction Act**

The Tax Injunction Act, 28 U.S.C. § 1341, provides that the federal courts "shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." The district court correctly rejected the County's contention that the Act rendered the court without jurisdiction to enjoin enforcement of Ordinance 12.[10]

Whether Ordinance 12 constitutes a "tax" for purposes of the Tax Injunction Act is a question of federal law, and we need not defer to the County's characterization of the Ordinance. Wright v. McClain, 835 F.2d 143, 144 (6th Cir. 1987). The Ordinance obviously raises revenue by way of the tipping fees charged by the HERC facility. This does not, however, render the Ordinance a tax. The Ordinance's primary purpose is clearly regulatory, rather than revenue-raising. See Government Suppliers

---

[9]We are mindful that granting standing to consumers bearing passed-on costs in Commerce Clause cases could have serious repercussions on state and local governments' ability to enact economic regulations. This is because they would risk enormous liability if such regulation is later invalidated. Here, for example, the waste generator plaintiffs' damage claims exceed $100 million. Especially in the current context, where the limits of local authority to regulate waste streams are still unclear, such risk presents a heavy burden to good faith efforts to enact valid laws intended to further important local goals.

[10]Plaintiffs also sought to enjoin the application of County Ordinance 15, which imposed a solid waste management fee on all waste generators in the County. The district court concluded that Ordinance 15 was a tax for purposes of the Tax Injunction Act, and dismissed that portion of the complaint for lack of jurisdiction. Plaintiffs have not appealed this order.

Consolidating Serv. v. Bayh, 975 F.2d 1267, 1271 n.2 (7th Cir. 1992) (fees generated by a flow control ordinance do not come within the Tax Injunction Act).

Furthermore, the plaintiffs do not question the County's authority to levy taxes. Rather, they challenge the County's regulation of their ability to deliver waste to the facilities of their choice. While the relief they seek may well affect the revenue that the County raises from the designated facilities, this secondary economic effect would not require the court to enjoin, suspend, or restrain any tax collection. Cf. Harvey & Harvey v. Delaware Solid Waste Auth., 600 F. Supp. 1369, 1375-76 (D. Del. 1985). Finally, we note that the County's argument would apply to the similar challenge to a flow control ordinance in Carbone, yet the Supreme Court in that case did not even question federal jurisdiction in striking the ordinance. We conclude that the Tax Injunction Act does not bar federal jurisdiction in this matter.

## C.    Commerce Clause

The Commerce Clause of the United States Constitution grants Congress the power "[t]o regulate Commerce . . . among the several States." U.S. Const. art I, § 8, cl. 3. The Supreme Court has long held that this grant of power to Congress contains negative implications that restrict states' power to regulate interstate commerce. CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69, 87 (1987). Under this "dormant Commerce Clause" jurisprudence, state laws that regulate commerce are subject to a two-step inquiry.

First, if a state law discriminates against interstate commerce "in favor of local business or investment," it is "per se invalid, save in a narrow class of cases in which the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." Carbone, 511 U.S. at 392. "Discrimination" for purposes of the Commerce Clause means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." Oregon Waste

Sys. Inc. v. Department of Envtl. Quality, 511 U.S. 93, 99 (1994); see also Cotto Waxo Co. v. Williams, 46 F.3d 790, 794 (8th Cir. 1995).  A state law may discriminate against interstate commerce on its face, in its purpose, or in its effect.  SDDS, Inc., 47 F.3d at 267.

Second, if a state law does not overtly discriminate against interstate commerce, it may nonetheless be contrary to the Commerce Clause if it unduly burdens interstate commerce.  Id. at 268.  A non-discriminatory state law, however, is subject to a less rigorous balancing test.  Such a law "will be upheld unless the burden imposed on . . . commerce is clearly excessive in relation to the putative local benefits."  Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970).

In this case, the district court held that Ordinance 12, as written, discriminates against interstate commerce.  In addition, the court held that the County's suspension of enforcement against haulers taking waste to out-of-state facilities did not save the Ordinance.  Rather, the court found that Ordinance 12 "as enforced" after the County's suspension of enforcement against waste bound out-of-state still discriminated against interstate commerce.  The district court thus found both aspects of the Ordinance invalid per se, and did not reach the Pike balancing test.

We agree with the district court that the County's partial suspension of enforcement puts this case "in a somewhat unusual posture."  Oehrleins, 922 F. Supp. at 1403.  We first note that we know of no authority for the proposition that a law that is facially invalid under the Commerce Clause may nonetheless be upheld "as enforced."  Accordingly, we find the analytical framework used by the parties to argue this case somewhat awkward.  The validity of the County's limited enforcement of the Ordinance to waste destined for in-state disposal is an important question, however, since plaintiffs seek section 1983 damages for that enforcement.

As for the validity of the Ordinance in its current form, however, we can easily distinguish between interstate and intrastate enforcement. In the 1993 resolution that directed the suspension of enforcement, the County also amended the Ordinance itself. That amendment bifurcated the Ordinance's definition of "designated waste," so that "designated waste" is waste bound for disposal within the state <u>and</u> waste bound for delivery out-of-state.[11] The new definition provides an obvious way to separately consider whether purely intrastate enforcement of the Ordinance is different from full enforcement. That is, if intrastate enforcement is permissible under the Commerce Clause but interstate enforcement is not, we may sever the offending half of the definition of "designated waste." We therefore separately consider these two aspects of Ordinance 12.

---

[11]The current definition is as follows:

"Designated Waste"

A. is mixed municipal solid waste generated in the County and destined for in-state disposal, excluding hazardous waste, infectious waste, and undesignatable waste; and

B. is mixed municipal solid waste generated in the County and destined for out-of-state disposal excluding hazardous waste, infectious waste, and undesignatable waste.

<u>Reprinted in</u> Appellant's App. at 141. The 1993 amendment of the definition appears to have been prompted by concerns that, while designation may have been constitutional with regard to waste staying in Minnesota, enforcement against waste bound for delivery out-of-state would be found impermissible. <u>See</u> Memorandum from Pat Diamond, Deputy County Attorney, <u>reprinted in</u> Appellees' App. at 63. The bifurcated definition was, in fact, intended to facilitate severability in the case of an adverse court ruling on interstate designation. <u>Id.</u>

**1.     Restrictions on Waste Destined for Out-of-State Shipment.**

Access to the market for waste processing, including this type of "flow control" ordinance, implicates the dormant Commerce Clause.  Carbone, 511 U.S. at 389; Waste Sys. Corp., 985 F.2d at 1386.  In Carbone, the Supreme Court considered a local flow control ordinance that required all local waste to be processed at a single designated facility. The Court held that because the ordinance effectively prohibited export of waste beyond state lines without the initial local processing, it discriminated against interstate commerce.  This was so even though the ordinance restricted waste transfer within the state as well.  Carbone 511 U.S. at 390-91.  See also Waste Sys. Corp., 985 F.2d at 1386-89 (holding that a similar designation ordinance applied to all county waste violated the Commerce Clause).  Carbone and Waste Systems squarely foreclose the County's argument that Ordinance 12 is "even-handed" and nondiscriminatory because it limits interstate export no more than intrastate transfer. To the extent that Ordinance 12 prohibits export of waste across state lines, it is irrelevant that the Ordinance also restricts garbage movement within the state.

The County argues that Ordinance 12 is different from the flow control ordinances in the above cases.  Carbone involved a local ordinance that, without exception, directed all local waste to a single in-town transfer station.  511 U.S. at 387. The ordinances  invalidated in Waste Systems also mandated deposit in a county composting facility, and provided for limited exclusions upon petition.  However, one of the criteria for exclusion was that any exclusion could not undermine the financial viability of the county facility.  Waste Sys. Corp., 985 F.2d at 1386.  In light of this, the court determined that the exclusion promise was "illusory" and that the ordinances "in practice, entirely forbid transport of waste out of the Counties."  Id. at 1387.

Ordinance 12, however, exempts all pre-1985 facilities from designation.  It also provides for the designation of additional facilities and for an exclusion process. Furthermore, there is evidence that the County has granted some exclusions to non-

designated facilities.  It is more difficult to simply label the exclusion process here as "illusory."  Relying on a Third Circuit case, the County argues that because exclusions are granted based on neutral, non-discriminatory criteria, the Ordinance is even-handed with respect to interstate commerce.  See Harvey & Harvey, Inc. v. County of Chester, 68 F.3d 788, 802 (3d Cir. 1995) (stating in dicta that open bidding and a fair selection process may not violate Commerce Clause, even if it results in exclusive designation of an in-state facility).

We need not decide the validity of this premise, however, because even if we were to agree with the Harvey dicta it would not save Ordinance 12 from rigorous scrutiny.  The initial designation here simply was not "open."  Ordinance 12 was enacted, in part, specifically to insure an adequate waste supply for a certain designated facility:  the HERC incinerator.  Indeed, the HERC plant was the only disposal facility the Ordinance initially designated, and the interim transfer stations were to accept designated waste for ultimate disposal at HERC.  The possibility of an out-of-state processor obtaining designation or getting a later exclusion  simply does not alter the initial immediate purpose and effect of the Ordinance, which was to grant an absolute preference to a particular local interest at the expense of all others.  The district court rightly concluded that, as applied to waste destined for transport outside Minnesota, Ordinance 12 discriminates against interstate commerce and is thus subject to rigorous scrutiny.   In light of Carbone and Waste Systems we hold that the interstate enforcement of the Ordinance cannot survive such scrutiny and  violates the Commerce Clause.

## 2.  Ordinance 12 as Applied Intrastate

Although the Commerce Clause prevents the County from restricting the flow of waste out-of-state, we must still consider whether the County may enforce flow control restrictions to waste that stays within Minnesota.  The district court held that

the Ordinance "as enforced" discriminates against interstate commerce and is thus invalid per se.

It is undisputed that the County has completely stopped penalizing haulers for carting waste to out-of-state facilities.  We cannot agree with the plaintiffs, however, that the remaining intrastate restriction on the flow of waste also discriminates against interstate commerce.  Although the County maintains a monopoly on waste that stays in-state, this does not amount to discrimination because local processors, even the designated facilities, are not being treated preferentially with respect to out-of-state facilities.  Here, there is no "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."  Oregon Waste Sys., 511 U.S. at 99.  The only preference granted to the designated facilities is with respect to other local operators.  This may create a monopoly at the local level, but as long as waste is allowed to flow freely in or out of the state, this does not constitute discrimination against interstate commerce.

Indeed, Ordinance 12 as enforced would seem to confer an economic benefit, not burden, to out-of-state interests.  Out-of-state landfills or other processing facilities are not barred from receiving Hennepin County waste.  Furthermore, out-of-state processors are apparently able to charge tipping fees substantially less than those charged by the County.  The Oehrleins plaintiffs stated in their pleadings, and again in their brief on appeal, that haulers in fact began to deliver waste to out-of-state processors as a response to the County's suspension of interstate enforcement in 1993. Encouraging delivery of County waste out-of-state imposes a burden only upon local concerns--including designated facilities--to the benefit of out-of-state facilities.  This may be economically distorting, but purely local monopolies or market controls that inure to the benefit of out-of-state concerns simply do not constitute "discrimination" under the Commerce Clause.

The plaintiffs argue, and the district court agreed, that intrastate flow control is nonetheless discriminatory. Relying on Carbone and Waste Systems, the plaintiffs argue that the Ordinance is discriminatory because it is solely a kind of "economic protectionism" that the Commerce Clause is intended to prevent. But as Carbone itself explains, "the central rationale for the rule against discrimination is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent." 511 U.S. at 390. A purely intrastate flow control regulation may well be "protectionist," but it is only so at the local level. When local facilities are competitively disadvantaged by a regulation that restricts their access to the market while out-of-state entities bear no such burden, there is little risk of inciting "jealousies and retaliatory measures" from neighboring states.

The district court also concluded that Ordinance 12 discriminates in effect by impeding long-term contracts with out-of-state processors because of the threat that the County might, in the future, resume full enforcement, and that this was indeed the County's purpose. We cannot agree. The plaintiffs have produced no evidence that the Ordinance has had such an effect, nor is there any evidence that the County intended the Ordinance to have such an effect. It is beyond dispute that the 1993 suspension of interstate enforcement allowed waste to flow freely to out-of-state processors, while working a comparative disadvantage to local entities. This hardly shows a purpose to discriminate against out-of-state concerns.[12]

_____

[12]In trying to show a discriminatory purpose, the plaintiffs put much weight on a memorandum from a deputy county attorney concerning the 1993 amendments to the ordinance and suspension of interstate enforcement. In this memorandum, the deputy county attorney states that the amendments and "a letter suspending the enforcement of designated waste destined for disposal outside the state of Minnesota, would put haulers on notice that it would not be prudent to enter into long-term contracts for waste disposal outside of the state at this time." Reprinted in Appellees' App. at 63. Even if we were to impute the deputy county attorney's opinion to the County, we do

-23-

The district court also reasoned that the Ordinance "as enforced" discriminates in effect by denying out-of-state concerns the ability to compete for local waste. To use the district court's example, "[a]n out-of-state concern which built a state-of-the-art processing facility in the middle of Hennepin County could not lawfully receive any waste from the County." Oehrleins, 922 F. Supp. at 1404. Thus, the district court concluded, Ordinance 12 discriminates against interstate commerce by prohibiting out-of-state entities full access to the local market in waste processing.

In reaching this conclusion, the district court relied on Carbone and Dean Milk Co. v. Madison, 340 U.S. 349 (1951), for the proposition that Ordinance 12 discriminates by prohibiting the "importation of waste processing services." Oehrleins, 922 F. Supp. at 1404. But the ordinance in Carbone subjected all waste, including waste bound out-of-state, to the local processing requirement. Out-of-state processors were thus "deprive[d] . . . of access to a local market." 511 U.S. at 389. Such is not the case here. Dean Milk invalidated a county ordinance that prohibited the sale in Madison, Wisconsin, of milk pasteurized outside of city boundaries. 340 U.S. at 350. Milk pasteurized at facilities in different states was thus completely cut out of the local market. Again, Ordinance 12 has no such effect. Quite to the contrary, it is undisputed that after the 1993 "suspension," out-of-state processors were permitted to and did, in fact, participate in the market for County waste by receiving waste.

not find this language as sinister as plaintiffs suggest. In our view, the memorandum merely reflects that, given the uncertainty of the law at the time, neither the County nor the waste haulers could anticipate what aspects of Ordinance 12 might ultimately be found valid or invalid. (At the time, the Supreme Court's decision in Carbone was pending. Indeed, the letter the County sent to haulers notifying them of the suspension of enforcement makes express reference to the uncertainty of the legal validity of flow control ordinances, and to the pending Carbone decision. Appellant's App. at 156.) Furthermore, even were we to credit the plaintiffs' assertion that the possibility of continued full enforcement of the Ordinance impedes out-of-state contracting, this threat simply evaporates given our holding that such enforcement would violate the Commerce Clause.

-24-

This "market access" theory also assumes that an out-of-state concern that permanently locates an operation within the state is still an "out-of-state" entity that can complain that a law that even-handedly restricts a local market is "discriminatory." The plaintiffs offer no authority for this position. A Delaware corporation doing business in Minnesota could not argue that it is discriminated against by Minnesota laws that apply equally to all businesses operating in the state. South Dakota companies may chose not to locate operations in Minnesota because of comparatively high state taxes that apply to all businesses, but this is not discrimination under the Commerce Clause.[13] Like any other local market regulation, Ordinance 12 may or may not encourage companies from doing business in the state. But while this may be a relevant concern in forming economic policies, it is simply not the proper inquiry for considering discrimination under the Commerce Clause. Cf. CTS Corp., 481 U.S. at 93-94 (quoting Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 127 (1978) ("We have rejected the 'notion that the Commerce Clause protects the particular structure or methods of operation in a . . . market."). Plaintiffs' analysis would render virtually all local economic regulations "discriminatory" and subject them to "per se" invalidation. This would vastly expand the implications of the dormant Commerce Clause, and we decline to follow such a course.

The plaintiffs argue that "interstate commerce" means more than "goods crossing state lines." This proposition is undoubtedly correct: even a non-discriminatory law may unconstitutionally burden interstate commerce. But if so, this is because that regulation fails the less rigorous balancing test of Pike, not because it is subject to rigorous scrutiny and virtually "per se invalidation." Restrictions on the ability of companies, regardless of state of origin, to process Hennepin County waste in Minnesota may be relevant to the Commerce Clause issue; but if so, this goes not to

---

[13]It would be a different matter, of course, if the state were to treat a company incorporated or principally located in another state differently from Minnesota companies on that basis.

a finding of "discrimination" but to whether the effect of the restriction is to impermissibly burden interstate commerce.[14] As we have stated before, "[n]egatively affecting interstate commerce is not the same as discriminating against interstate commerce." Cotto Waxo, 46 F.3d at 794. In this case, the district court conflated "discrimination" with "effect on commerce" and applied rigorous scrutiny when balancing is called for.

We hold, therefore, that intrastate designation as currently enforced pursuant to Ordinance 12 does not discriminate against interstate commerce, and is thus contrary to the Commerce Clause only if it fails the Pike balancing test. Under Pike, those portions of Ordinance 12 that apply to waste destined for in-state disposal are only unconstitutional if "the burden imposed on . . . commerce is clearly excessive in relation to the putative local benefits." Pike, 397 U.S. at 142. Because the district court incorrectly held that the intrastate application of Ordinance 12 was per se invalid, rather than applying the appropriate balancing test, we reverse and remand. We remand to the district court for consideration of whether the burden on interstate commerce clearly exceeds the local benefits. In conducting this review, the district court should consider all of the interests advanced by the Ordinance in the entire context of the County's master plan and designation plan. These include those anticipated benefits outlined in the designation plan, including landfill abatement, County-wide coordination of waste management, the production of energy, resource recovery, and the goals of the Waste Management Act that the Ordinance was intended to advance.[15]

------

[14]Accordingly, the plaintiffs' argument that out-of-state companies are effectively prevented from operating waste-to-energy processing plants may be relevant to a Pike analysis, provided that there is evidence that an interest in developing such facilities actually exists and is frustrated by the Ordinance.

[15]We reject plaintiffs' assertion that the County's goal in enacting Ordinance 12 must be strictly distinguished from the overall interests served by the designation plan, and that the sole goal of Ordinance 12 is to ensure the financial viability of the HERC

## III.  CONCLUSION

The certified class of consumers of waste disposal services represented by Robinson Rubber Products lacks standing in this Commerce Clause action.  In regard to the remaining hauler and processor plaintiffs, we conclude that those provisions of Ordinance 12 that prevent the delivery of Hennepin County solid waste to facilities outside of the state discriminate against interstate commerce and so violate the Commerce Clause of the United States Constitution.  Those provisions of the Ordinance, however, that restrict intrastate delivery of waste to non-designated facilities do not discriminate against interstate commerce.  We remand to the district court for a determination whether the putative local benefits of the intrastate

---

facility.  The Ordinance's preamble and the County resolution adopting the Ordinance make explicit reference to the environmental  interests the Ordinance seeks to advance; the County's designation plan likewise summarizes in great detail various expected benefits of designation.  While we may legitimately balance the County's purported interests against the Ordinance's burden on interstate commerce, we have no authority to instruct the County that those stated interests are not really interests.  Waste Sys. Corp., 985 F.2d 1381, is not to the contrary.  In Waste Systems, the court found that the ordinance at issue facially discriminated against interstate commerce, and that the county's overarching environmental goals could not offset that discrimination.  Id. at 1388.  In this case,  Ordinance 12 is plainly part of a waste management framework developed over several years, and is inextricably bound up with the County's waste management master plan and designation plan developed pursuant to the Waste Management Act.  To lift out of context a statement from Waste Systems and argue that "even if the [County] acted out of legitimate environmental concern when constructing the [HERC facility], the purpose of the [facility] is not the same as the purpose of [Ordinance 12]" is to ignore reality.  Id.

enforcement of Ordinance 12 are clearly outweighed by the burdens on interstate commerce, and for further proceedings consistent with this opinion.[16]

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[16]Appellees' motion to strike the briefs of the State of Minnesota as amicus curiae is denied.

-29-