**U & I SANITATION, Plaintiff,**

v.

**CITY OF COLUMBUS, Defendant.**

**No. 4:97CV3334.**

United States District Court,
D. Nebraska.

March 19, 1998.

Douglas J. Peterson, Knudsen, Berkheimer, Richardson, Endacott & Routh, Lincoln, NE, for Plaintiff.

John P. Heil & Patrick J. Ickes, Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, Omaha, NE, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KOPF, District Judge.

Following a bench trial and briefing, the court now issues its findings of fact and conclusions of law[1] according to Federal Rule of Civil Procedure 52(a). For the reasons set forth below, we find and conclude that judgment should be entered for Defendant, the City of Columbus.

### I. BACKGROUND

Plaintiff U & I collects mixed solid waste in the city of Columbus, Nebraska. It hauls the waste to a city-operated transfer station. Mixed solid waste includes materials like paper, plastic, and metal that could be recycled if the materials were removed from the waste stream. U & I pays a "tipping fee" to dispose of the trash at the transfer station. The mixed solid waste is then taken to a Nebraska dump partially "owned" by the City of Columbus. At that Nebraska site, the waste is buried.

U & I does not sell the trash it collects. On the contrary, U & I must pay a fee to rid itself of the waste. Thus, U & I has an economic interest in disposing of the mixed solid waste at the lowest possible cost.

While U & I has no out-of-state contracts for disposal of the waste, if U & I wished to

---

1. To the extent the court's findings of fact can be construed as conclusions of law, they should be so construed. Similarly, to the extent the court's conclusions of law can be construed as findings of fact, they should be so construed.

do so, the City of Columbus would allow the company to haul the mixed solid waste to an out-of-state facility for disposal. Moreover, if U & I decided to require its customers to remove recyclable materials from the waste stream ("curbside recycling"), the City would permit U & I separately to collect and haul the recyclable materials to any site it wanted.

U & I argues that the City of Columbus cannot require that mixed solid waste *destined for disposal in Nebraska* be deposited at the city's transfer station. On the contrary, U & I believes it should be able to dispose of the solid waste, including the recyclable materials mixed therein, at another site in Nebraska known as the Butler County MRF.

The Butler County MRF charges U & I a lower "tipping fee" than the one charged by the City of Columbus. The Butler County MRF will sometimes strip recyclable materials from the rest of the trash it receives. If it does so, the Butler County MRF will then sell those recyclable materials to entities that engage in interstate commerce with such materials.

This lawsuit seeks a permanent injunction barring enforcement of (1) a City of Columbus ordinance requiring waste haulers to deposit in the City's transfer station waste collected within the city that is destined for disposal within the State of Nebraska, and (2) a City of Columbus resolution that suspended U & I's license to haul solid waste for one year because of the company's failure to comply with the above ordinance.

U & I alleges that enforcement of the city ordinance violates the "dormant" Commerce Clause, U.S. Const. art I, § 8, cl. 3, and 42 U.S.C. § 1983, and that the suspension of U & I's license is a taking of its property without just compensation in violation of the Fifth Amendment to the United States Constitution and Article I, sections 3 and 21, of the Nebraska Constitution. Specifically, plaintiff U & I complains that the ordinance effectively prevents the removal of recyclable material from mixed solid waste by the Butler County MRF. Consequently, U & I argues that the ordinance prevents the Butler County MRF from selling the reusable paper, plastic, and metals in interstate com-

merce, and the Commerce Clause is violated as a result. U & I is allegedly harmed because it cannot deal with the Butler County MRF under the City's ordinance.

This court previously denied U & I's motion for temporary restraining order (filing 13) upon the City's concession that it would not enforce its suspension resolution against U & I if the company complied with the ordinance. U & I's motion for preliminary injunction and the trial on the merits of this case were consolidated into a two-day bench trial.

## II. FINDINGS OF FACT

### The ISWMA

1. In 1992 the Nebraska Legislature enacted the Integrated Solid Waste Management Act, Neb.Rev.Stat. §§ 13–2001 to 13–2043 (Michie 1995) ("ISWMA"), in which the Legislature explicitly noted the threat posed by the "rapidly rising volume of waste deposited by society" on the "capacity of existing and future landfills"; the "threat to the ground water supply" posed by the burying of "unknown quantities of potentially toxic and hazardous materials"; and waste disposal methods which hinder decomposition. Neb.Rev.Stat. § 13–2002(1) (Michie 1995). The ISWMA declares it the policy of the State of Nebraska to "encourage the development of integrated solid waste management programs," that is, "programs and facilities that reduce waste toxicity and volume, recycle marketable materials, and provide for safe disposal of residuals." Neb.Rev.Stat. §§ 13–2011 & 13–2017 (Michie 1995). The ISWMA further establishes a "solid waste management hierarchy, in descending order of preference" which the Legislature characterizes as the "integrated solid waste management policy of the state":

(a) Volume reduction at the source;

(b) Recycling, reuse, and vegetative waste composting;

(c) Land disposal;

(d) Incineration with energy resource recovery; and

(e) Incineration for volume reduction. Neb.Rev.Stat. § 13–2018(1) (Michie 1995).

2. Effective October 1, 1993, the ISWMA required all Nebraska counties and municipalities to "provide or contract for facilities and systems as necessary for the safe and sanitary disposal of solid waste generated within its solid waste jurisdiction area," Neb. Rev.Stat. § 13–2020(1) (Michie Supp.1997). The Act required each county and municipality to file an integrated solid waste management plan with the Nebraska Department of Environmental Quality by October 1, 1994, Neb.Rev.Stat. § 13–2031 (Michie 1995), and such plans were required to provide for local waste-reduction and recycling programs. Further, "[i]f technically and economically feasible," the volume of waste disposed of in landfills was to be reduced by 25 percent by July 1, 1996; 40 percent by July 1, 1999; and 50 percent by July 1, 2002. Neb.Rev.Stat. § 13–2032(2) (Michie 1995). The ISWMA also prohibits land disposal of certain solid wastes, such as yard waste. Neb.Rev.Stat. § 13–2039 (Michie 1995).

3. The ISWMA allows counties and municipalities to reach service agreements with other municipalities or counties that own or operate solid waste management facilities and to make payments under such agreements from revenue received from providing solid waste management services. The governing body of the counties or municipalities entering such service agreements may levy a special tax to cover revenue deficiencies in their provision of solid waste management services. Neb.Rev.Stat. § 13–2024 (Michie 1995).

4. The City of Columbus reached such a service agreement with the Northeast Nebraska Solid Waste Coalition to provide regional integrated solid waste management facilities and services. Under the agreement, the City of Columbus is obligated to pay part of the debt for building the coalition landfill should such debt not be retired through revenues generated from the coalition landfill. (Exs. 1, 2, 3, 5; Tr. 66:15–21, 67:20–23.) The City of Columbus meets its financial obligations to the coalition by collecting "tipping fees" at the Columbus Transfer Station. (Tr. 67:24–68:3.)

5. The City of Columbus, Nebraska, hired Patricia Lynaugh in 1993 to develop the City's 20–year waste management plan required by the ISWMA. (Tr. 7:9–21; Ex. 12.)

### City Ordinance & Resolution Suspending U & I's License

6. On August 18, 1997, the city council of Columbus adopted Ordinance 97–21, which amended section 8–2–7 of the Columbus City Code, to read in relevant part:

> (A) It shall be unlawful, except as set forth herein, to unload or deposit any garbage, refuse, yard waste and the contents of privy vaults and cesspools hauled from any premises within the corporate limits of the City, and destined for disposal within the State of Nebraska, at any place other than the approved disposal site designated by the Mayor and Council.

Section 8–2–7(B) of the Columbus City Code, as amended by Ordinance 97–21, makes garbage and refuse collectors subject to license revocation for failure to dispose of the above-described waste "at the disposal sites so designated by the Mayor and Council." (Exs. 4 & 101.) The disposal site designated by the Columbus mayor and city council is the Columbus Transfer Station. (Tr. 25:7–10; 31:16–23.) Under this ordinance, trash collected in Columbus and intended to be landfilled must be delivered to the Columbus Transfer Station, but garbage and refuse haulers are "free to pull recyclables ... prior to coming to the transfer station." (Tr. 25:7–12.)

7. The City amended Section 8–2–7(B) of the Columbus City Code by Ordinance 97–21 upon the advice of counsel and for the purpose of clarifying that if the City's eight garbage haulers intended to landfill refuse collected within the Columbus corporate city limits, such landfilling must be done at the coalition landfill through the Columbus Transfer Station. The amendment was prompted by the City's concern that U & I Sanitation was taking its solid waste to Butler County, Nebraska, instead of depositing

it at the Columbus Transfer Station. (Tr. 265:7–266:25.)

8. On September 11, 1997, the Columbus city administrator notified the Columbus mayor and city council by memo that he observed plaintiff U & I violating the above ordinance by collecting solid waste from inside the Columbus city limits and failing to deliver this solid waste to the Columbus Transfer Station. (Ex. 10.) The Columbus Transfer Station crew chief notified the City that U & I was taking solid waste collected in Columbus to Butler County, Nebraska. (Tr. 31:24–32:11.)

9. The City estimated that without U & I's delivery of solid waste to the Columbus Transfer Station, it would suffer a 20 percent loss in revenue, which in turn would hurt the City's integrated waste management program because the program is subsidized by tipping fees collected at the Transfer Station. (Tr. 33:14–20, 40:16–22; Ex. 9.) Further, the City was concerned that U & I's delivery of waste to a location outside Columbus increased the City's exposure to liability should "leakage or some type of waste problem" develop in another landfill that contained Columbus waste. (Tr. 37:4–19; Ex. 9.) There is no evidence that U & I's delivery of solid waste to a site other than the Columbus Transfer Station created a public health or safety risk within Columbus itself. (Tr. 33:25–34:8.)

10. After notice provided to U & I, the Columbus city council conducted a hearing on October 6, 1997, to decide whether they should suspend or revoke U & I's license for violation of city ordinance 8–2–7. (Exs.6, 11, 103.)

11. On October 20, 1997, the Columbus mayor and city council enacted Resolution R97–119, which suspended U & I Sanitation's collector's license for one year effective November 1, 1997. (Exs.7, 102, 114.) The mayor and the city council made specific findings in the resolution that (1) transfer station "tipping fees" paid by individuals and licensed haulers depositing garbage collected from within the City primarily fund the City's integrated solid waste management

program, which consists of a yard waste composting program, a wood waste program, a recycling center for source-separated recyclables, and a transfer station and landfill disposal operation; (2) revenues generated from recyclables sold by the City's recycling center are insufficient to fund the City's integrated solid waste management program; and (3) the mandatory disposal requirement of Ordinance 97–21 applies only to solid waste collected in the City and destined for landfill disposal within the State of Nebraska, and does not restrict the disposal of recyclables collected as part of such solid waste. (Exs. 7 & 102.)

12. Since November 1, 1997, U & I has taken all solid waste it has collected within Columbus to the Columbus Transfer Station. (Tr. 117:13–16.)

13. The City of Columbus concedes that it will not enforce its prior suspension resolution against U & I if U & I complies with City of Columbus Ordinance 97–21. (Tr. 234:8–23.)

### The City of Columbus Solid Waste Collection & Recycling

14. As of the date of the bench trial in this matter[2], there were eight private refuse haulers in Columbus. These haulers, one of whom is plaintiff U & I Sanitation, take the solid waste they collect to the Columbus Transfer Station, where it is then transported to the coalition landfill just outside Clarkson, Nebraska, approximately 48 miles from Columbus. (Tr. 25:3–6; 26:3–16; 148:6–14.) The City takes its solid waste to only one landfill to avoid potential liability should hazardous material be found in waste delivered to other facilities. (Tr. 281:19–282:6.)

15. The City currently charges a "tipping fee" of $49.00 per ton for municipal solid waste deposited at its transfer station. (Tr. 28:19–21.) The solid waste deposited at the transfer station is inspected for hazardous material. (Tr. 150:16–151:1.) None of the garbage collected at the Columbus Transfer

---

**2.** February 9 and 10, 1998.

Station is sorted to separate out recyclable materials.[3] (Tr. 152:6–14.)

16. The City of Columbus generates approximately 20,000 tons of solid waste per year, and of that total, roughly 477 tons—or 2.4 percent[4]—constitutes recyclable products collected at the City's voluntary recyclable drop-off site.[5] "Recyclable products" includes steel, plastic, newspaper, aluminum, cardboard, "office pak," and magazines, and does not include recyclables that are mixed with other non-recyclable waste. (Tr. 18:22–22:15; 248:1–21; Exs. 104 & 105.) Disregarding the 477 tons of recyclables collected at the City's voluntary recyclable drop-off site, the remaining 19,523 tons of solid waste generated by the City of Columbus per year contains a "significant portion" of paper, plastic, and metal products that are not separated out by residents before disposal. (Tr. 22:19–23:3.)

17. The materials collected at the City's recyclable drop-off center, plus the yard and tree waste collected by the City, resulted in a diversion of 3,721.4 tons from the landfill in the 1996–1997 fiscal year. (Ex. 104; Tr. 252:3–6.)

18. The City's voluntary recyclable drop-off center can be used 24 hours a day and is staffed for part of each day of the week. (Tr. 240:11–241:7.) Residents and businesses that deposit recyclables at the City's recycling center are not charged or paid for dropping off recyclables. (Tr. 245:21–25; 247:17–21.)

19. The recyclable products collected at the City's voluntary recyclable drop-off site are sold and transported to Nebraska businesses that buy recyclable products, such as Midland Recycling in Lincoln, Nebraska. (Tr. 23:4–7; 258:7–10; 259:5–6; 259:22–25; 261:4–5.) The revenue the City receives for its recyclables is affected by the "national recyclable market." (Tr. 24:16–19.) Because the revenue generated from recyclable sales is not sufficient to support the City's recycling center, the center is subsidized by solid waste tipping fees collected at the Columbus Transfer Station. (Tr. 38:7–15.)

20. In 1994, the City of Columbus received $2,704.80 for the recyclables it sold; in 1995, the City received $19,523.36 from recyclable sales; in 1996, a 14–month fiscal year, the City received $36,333.13 from its sale of recyclables; in 1997, the City received $8,385.74 from its sale of recyclables; and the City received $2,811.93 for the first three months of the current fiscal year from its sale of recyclables. (Tr. 228:14–229:24; Ex. 17.) In contrast to recyclables, there is no "market" for solid waste from which the recyclables have been removed.[6] (Tr. 278:1–11.) To market its yard waste, the City would have to add value to it to make it into acceptable compost and mulch. (Tr. 278:16–280:4.)

21. When the City studied the feasibility of operating a curbside recyclable-pickup program in 1993, it determined that such a

---

3. The Columbus Transfer Station is open Monday through Friday until 3:45 p.m. and on Saturday until 11:45 a.m. (Tr. 145:5–9.) On average, a compactor truck can complete unloading at the transfer station in 10 minutes. (Tr. 145:22–25.)

4. According to engineer Dan Costello, who manages the solid waste facilities section in the Omaha office of a large architectural and engineering firm, diversion of two percent of the residential waste stream through voluntary recyclable drop-off programs is consistent with other such programs throughout the country. (Tr. 289:21–23; Ex. 110.)

5. The amount of recyclable products generated by the City of Columbus per year was calculated by figuring the average amount of recyclables collected from 1993 to 1997. Such calculation does not include yard waste because such waste

is no longer accepted by the Columbus Transfer Station. At trial, Plaintiff's counsel calculated an average of 468 tons per year of recyclable products collected by the City of Columbus from 1993 to 1997, and Ms. Lynaugh testified that the average "sound[ed] about accurate." (Tr. 21:10–15.) However, the amount of recyclables collected in fiscal year 1996–1997 was 586.01 tons, as opposed to 556 tons as used by counsel in his calculations. (See Exhibit 104 & Tr. 21:6.) Therefore, the average tons per year of recyclable products collected by the City of Columbus from 1993 to 1997 as calculated by the court differs from that stated at trial.

6. While various landfills would like to receive the City's solid waste residue at a fee to be paid by the City, the residue cannot be "marketed" in the sense that someone would purchase it. (Tr. 280:12–281:9.)

program was not economically feasible. (Tr. 274:17–25.)

22. Engineer Dan Costello, who manages the solid waste facilities section in the Omaha office of a large architectural and engineering firm that performs solid waste projects nationwide, found the City of Columbus' voluntary recyclable drop-off program and yard waste collection program to be "very predominant" throughout the country, and programs requiring curbside separation of recyclables involve costs that exceed the savings or revenue such programs typically generate. (Tr. 295:15–12.)

### U & I Sanitation & The Butler County Landfill

23. U & I Sanitation is a family-owned and operated business that serves approximately 1800 residential customers and 170 commercial customers in Columbus. (Tr. 93:19–22; 96:2–9.) The City of Columbus constitutes more than 90 percent of U & I's garbage-hauling market. (Tr. 233:2–3.) U & I charges $14.50 per month for once-a-week residential garbage pickup, and the rate for commercial customers varies based on volume. (Tr. 97:1–7; 127:4–10.) U & I's license would not preclude it from developing a varied rate structure for its residential customers; that is, one rate for recyclables only and one rate for other garbage. (Tr. 127:11–25.)

24. Due to the necessity of hiring personnel, purchasing more trucks, and obtaining a facility to house recyclables, U & I cannot economically afford to start a voluntary recycling program involving curbside separation of recyclables. (Tr. 110:8–111:1.) However, U & I occasionally pulls metal items from the waste set out for pickup and delivers the metal to Columbus Metal. (Tr. 124:15–24.) U & I has also delivered a "pure load of cardboard" to the City's recycling center. (Tr. 245:8–17.)

25. From June to October of 1997, U & I took some solid waste it collected from the Columbus area to the Butler County Landfill because of "price and how they operate." (Tr. 106:7–25, 116:23–117:8; Ex. 113.) Specifically, the Butler County Landfill and material recovery facility ("MRF") charged U & I approximately $23.25 per ton for depositing garbage at its facility, as opposed to the $49.00 per ton being charged by the City of Columbus. (Tr. 106:23–107:5; 114:9–11.) [7] Further, the Butler County facility "recycl[es] ... instead of putting [the garbage] on a semi and ... burying it." (Tr. 106:25–107:1.)

26. There are three licensed MRFs in Nebraska, one of which is in Butler County. The Butler County MRF, which began operating in November 1996, receives mixed solid waste that is dumped on the tipping floor of the facility and then processed by sending the waste up a conveyor belt, from which recyclable and bulky, non-shreddable material is hand-separated from the commingled waste. The non-recyclable material is shredded and landfilled and the recyclables are marketed. (Tr. 132:12–133:1; 158:21–159:18; 167:5–7.)

27. The Butler County Landfill and MRF was built in an attempt to satisfy the requirements set forth by the ISWMA in a "real economical way." (Tr. 165:15–166:1.) Approximately one-third of the $600,000 capital investment required to build the Butler County Landfill and MRF was provided by grants from the Nebraska Environmental Trust Fund and the Waste Reduction Recycling Fund. (Tr. 200:2–201:19.)

28. The usage charge at the Butler County Landfill and MRF is negotiable and dependent on many factors, but generally the "landfill only" rate is $26.25 per ton, and the MRF rate is higher. (Tr. 218:24–220:22.) It costs the Butler County Landfill and MRF $30.00 to $35.00 per ton [8] to process garbage

---

7. Prior to November 1997, the Columbus Transfer Station charged $43.25 per ton. On November 1, 1997—the date U & I began depositing its garbage at the transfer station instead of the Butler County Landfill—the transfer station began charging $49.00 per ton. (Tr. 148:18–25.) The City's reason for the tipping-fee increase is

increased transportation and program costs. (Tr. 262:14–25.)

8. The general manager of the Butler County Landfill and MRF testified that this amount includes "[e]verything": wages, disposal fees, maintenance and repairs, depreciation, utilities, and transportation of recyclables to the point of

through the MRF, and the revenue generated per ton from the sale of recyclables from that garbage is $13.50 per ton. (Tr. 225:24–226:11.) In 1997, the Butler County Landfill and MRF generated $121,000 in revenue from selling recyclable products, but did not make a profit. (Tr. 176:5–7; 179:6–7.) Engineer Dan Costello testified that MRFs "very seldom" pay for themselves through sale of recyclables, with the goal of such facilities instead being diversion from landfills. (Tr. 309:19–21; 310:18–10.)

29. The Butler County Landfill and MRF serves 70 to 80 communities, and has the capacity to process 80 to 100 tons of solid waste per day, although it is currently processing only 55 to 65 tons per day. (Tr. 156:22; 169:13–17; 177:6.) It receives between 150 to 200 tons per day. (Tr. 215:23–24.) Of all solid waste its receives, the Butler County Landfill and MRF reduces the amount received by 16 percent in weight and 28 percent in volume. (Tr. 169:22–170:5.) With such a reduction, the MRF facility has been projected to add four years of life to the Butler County Landfill, which is a 25–year facility. (Tr. 180:1–6.)

30. The general manager of the Butler County Landfill and MRF sees the facility as a "service to replace volunteer efforts." (Tr. 155:7–9; 176:23.)

31. The parties agree that some recyclables recovered from the loads of solid waste U & I delivered to the Butler County Landfill and MRF facility entered the stream of interstate commerce by going into recyclable markets throughout the country. (Ex. 16; Tr. 51:15–52:5.) According to the Butler County facility, it could send 16 percent of the waste received from U & I into recyclable markets, with the remaining 84 percent going to its landfill.[9] (Tr. 172:18–173:2.) For example, in 1997 Midland Recycling in Lincoln, Nebraska, received recyclable products from the Butler County Landfill, and such products were sold in Iowa, Oregon, Oklahoma, and Nebraska. (Tr. 78:11–18; 79:1–11; 81:10–22.) Alter Scrap Processing in Council Bluffs, Iowa, received steel and aluminum cans from the Butler County Landfill in 1997. Alter Scrap Processing sells processed scrap metals to various steel mills in the Midwest, including Iowa, Illinois, Missouri, and Nebraska. (Tr. 82:22–14; 84:7–14.) Finally, Sandhill Plastics, which manufactures recycled plastic into flat-sheet plastic products, received plastic from Butler County Landfill in 1997. Sandhill Plastics sells its products in Nebraska, Kentucky, and Oklahoma. (Tr. 87:20–23; 88:20–22; 90:19–25.)

32. If U & I decided to dump its daily garbage collections at its place of business and sort through the garbage to collect recyclables, it would have to be licensed pursuant to Nebraska Department of Environmental Quality regulations. (Tr. 134:25–135:12; Ex. 112.) Similarly, the Columbus Transfer Station would have to be licensed under the same regulations to perform recyclable-separation functions at its facility. (Tr. 136:16–19.) There is currently no business or organization in the City of Columbus that sorts out recyclables from mixed waste like the Butler County MRF, and the City has not considered developing its own MRF. (Tr. 264:12–265:3; 275:24–276:1.)

33. Without doubling the amount U & I charges its customers, it is not economically or practically feasible for U & I to take all garbage collected within Columbus to the Butler County Landfill at $23.25 per ton, and then return the non-recyclable residue to be landfilled at the Columbus Transfer Station at $49.00 per ton. (Tr. 112:12–116:19.) Further, because it would take four to five hours to process U & I's waste at Butler County, U & I would have difficulty completing its trash route, traveling to the Butler County facility, waiting for its material to be processed, and returning to the Columbus Transfer Station

sale. (Tr. 207:18–209:7.) Engineer Dan Costello testified that MRF processing costs range from $10.00 to $20.00 per ton, but this amount does not include debt on the building, cost of land, cost of disposal of the nonusable residue, or the cost of transporting the recovered recyclables to market. (Tr. 297:9–298:11.)

9. Due to removal of machinery and other operational changes, some of U & I's loads were delivered directly to the Butler County Landfill without first going through the MRF. (Tr. 187:3–8; 190:2–191:19.)

by its 3:45 p.m. closing time. (Tr. 113:15–21; 173:10–174:2.)

### Diversion of Waste from Landfills by Method

34. Various methods can divert portions of the waste stream from landfills and with differing results: (1) voluntary recyclable drop-off programs like that operated by the City of Columbus typically result in a two percent reduction in weight; (2) yard waste collection and composting facilities in this area of the country can divert 25 percent of the waste stream from landfills; (3) curbside separation of recyclables can divert 15 percent; and (4) MRFs can divert from five to 30 percent depending upon how "clean" the waste stream is—commercial and industrial waste is typically "clean," while residential waste delivered in a compactor truck is classified as "dirty" waste. (Tr. 287:19–292:12; 294:13–16.)

## III. CONCLUSIONS OF LAW

As noted earlier, U & I claims that the ordinance enacted by the City of Columbus, with the suspension order, violates the Commerce Clause of the United States Constitution. While admitting that most (more than 80 percent) of the solid waste it deals with will never leave Nebraska, plaintiff U & I argues that the ordinance nevertheless violates the Commerce Clause because the law prevents " 'dirty recyclables' which are intermixed with the solid waste collected from Columbus customers from being separated and eventually sold into the interstate market of recyclable paper, plastic, and metals." (Pl.'s Closing Arg. at 1.)

A similar case guides our analysis. Judge Beam, writing for the United States Court of Appeals for the Eighth Circuit, recently set forth the legal principles that govern this case both in terms of standing and in relation to the Commerce Clause. *Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin County,* 115 F.3d 1372, 1378–82, 1383–88 (8th Cir.) (affirming in part and reversing in part district court's declaration that the county's solid waste "flow-control" ordinance was per se unconstitutional; remanding for application

of a balancing test), *cert. denied,* —— U.S. ——, 118 S.Ct. 629, 643, 139 L.Ed.2d 609 (1997).

The *Oehrleins* court held that a part of a county ordinance requiring that municipal solid waste generated within the county be delivered to designated facilities within the State of Minnesota violated the Commerce Clause to the extent that it "prohibits export of waste across state lines." *Id.* at 1384. Yet the court also held that a part of the county ordinance requiring that municipal solid waste "destined for in-state disposal" be disposed of in certain designated in-state facilities "does not discriminate against interstate commerce" unless the restriction "fails the *Pike* balancing test." *Id.* at 1387 (*Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970)).

Accordingly, the court remanded to the district court for reconsideration of that part of the ordinance concerning solid waste "destined for in-state disposal." The district court was instructed to apply the less rigorous *Pike* balancing test.

In resolving the case on the merits, the court held that various waste haulers and processors had standing. *Id.* at 1379. In contrast, the court additionally held that local consumers did not have standing. *Id.* at 1382.

Applying *Oehrleins,* we will first determine whether the plaintiff has standing. We will then state the legal principles derived from *Oehrleins* that govern the plaintiff's Commerce Clause claim.[10] Finally, we will apply the principles derived from *Oehrleins* to the facts.

### A. Standing

■ We find that U & I has standing to bring this action. U & I has standing because: (1) it has suffered an injury in fact that is both concrete and particularized, as well as actual and imminent (as a hauler, U & I has suffered a suspension of its permit to haul waste because it violated the ordinance and the City threatens to enforce the suspension if U & I does not comply with the

---

10. It is undisputed that if the Commerce Clause claim fails, then so do Plaintiff's other claims.

ordinance); (2) there is a causal connection between the injury (suspension) and the defendant's conduct (imposing the suspension); and (3) it is likely that a favorable decision will redress the injury (an injunction barring suspension will protect U & I). *Id.* at 1378 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559–60, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

### B. The Commerce Clause

The *Oehrleins* court began its discussion of the Commerce Clause by recognizing that the clause grants Congress the power " '[t]o regulate Commerce ... among the several states.' " *Id.* at 1383 (citing U.S. Const. art I, § 8, cl. 3). "The Supreme Court has long held that this grant of power to Congress contains negative implications that restrict states' power to regulate interstate commerce. Under this 'dormant Commerce Clause' jurisprudence, state laws that regulate commerce are subject to a two-step inquiry." *Id.* (citing *CTS Corp. v. Dynamics Corp. of America,* 481 U.S. 69, 87, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987)).

The first step in the inquiry is to decide whether the state law overtly "discriminate[s] against interstate commerce on its face, in its purpose, or in its effect." *Id.* (citing *SDDS, Inc. v. South Dakota,* 47 F.3d 263, 267 (8th Cir.1995)). " 'Discrimination' for purposes of the Commerce Clause means 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.' " *Id.* (citing *Oregon Waste Sys. Inc. v. Department of Envtl. Quality,* 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994)). However, " '[n]egatively affecting interstate commerce. is not the same as discriminating against interstate commerce.' " *Id.* at 1387 (quoting *Cotto Waxo Co. v. Williams,* 46 F.3d 790, 794 (8th Cir.1995)).

If the state law discriminates on its face, in its purpose, or in its effect, usually [11] the law is " 'per se invalid.' " *Id.* at 1383 (quoting

*Carbone,* 511 U.S. at 392). Stated differently, a local law is per se invalid if, on its face, in its purpose, or in its effect, it risks "inciting 'jealousies and retaliatory measures' from neighboring states." *Id.* at 1386 (quoting *Carbone,* 511 U.S. at 390).

■ "Second, if a state law does not overtly discriminate against interstate commerce, it may nonetheless be contrary to the Commerce Clause if it unduly burdens interstate commerce." *Id.* at 1383 (citing *SDDS, Inc.,* 47 F.3d at 268). Where the law is not discriminatory, it "is subject to a less rigorous balancing test." *Id.* "Such a law 'will be upheld unless the burden imposed on ... commerce is clearly excessive in relation to the putative local benefits.' " *Id.* (quoting *Pike,* 397 U.S. at 142).

### C. The Commerce Clause and the Facts

■ Applying the "two-step" analysis required by *Oehrleins,* we first decide whether the City's ordinance overtly discriminates; that is, we decide whether the ordinance discriminates "on its face," we decide whether the ordinance discriminates "in its purpose," and we decide whether the ordinance discriminates "in its effect." Finding that the ordinance does not overtly discriminate, we next apply the *Pike* balancing test.

#### 1. Overt Discrimination

As noted earlier, a state law violates the Commerce Clause when it overtly discriminates against interstate commerce; that is, a state law that obviously risks "inciting 'jealousies and retaliatory measures' from neighboring states" will be found to violate the clause. *Id.* at 1386 (quoting *Carbone,* 511 U.S. at 390). There are three facets to this question.

#### a. Discrimination "On Its Face"

The ordinance states in pertinent part that:

> (A) It shall be unlawful, except as set forth herein, to unload or deposit

11. Even an overtly discriminatory law can be upheld if the municipality " 'demonstrate[s], under rigorous scrutiny, that it has no other means to advance a legitimate local interest.' " *Id.* at 1383 (quoting *C & A Carbone, Inc. v. Town of*

*Clarkstown,* 511 U.S. 383, 392, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994)). The City of Columbus does not seek to place itself within this " 'narrow class of cases.' " *Id.* (quoting *Carbone,* 511 U.S. at 392.)

any garbage, refuse, yard waste and the contents of privy vaults and cesspools hauled from any premises within the corporate limits of the City, and *destined for disposal within the State of Nebraska*, at any place other than the approved disposal site designated by the Mayor and Council.

Ord. 97–21 (emphasis added).

The ordinance regulates only garbage "destined for disposal within the State of Nebraska." Therefore, the law does not facially discriminate against interstate commerce. *Oehrleins*, 115 F.3d at 1384 n. 11 (finding an ordinance that pertained to waste " 'destined for in-state disposal' " did not facially violate the Commerce Clause).

### b. Discrimination "In Its Purpose"

We must next decide whether the City enacted the ordinance with a discriminatory purpose. Ultimately, we find and conclude that there is no persuasive evidence that the defendant enacted the ordinance to influence interstate commerce.

The purpose behind the ordinance was twofold. One purpose was to "protect" the City's investment in a particular in-state landfill and to provide "tipping-fee" income for other efforts by the City to comply with ISWMA. The other purpose was to avoid liability exposure regarding other in-state landfills not controlled by the City.

The City sought to promote those dual purposes by the ordinance, but only to the extent that it could do so consistent with the law overall and the Commerce Clause in particular. The plain language of the ordinance (clearly limiting its reach to in-state disposal of solid waste) is compelling proof that the City of Columbus did not enact the law to violate the Commerce Clause.

It is true that the ordinance is "protectionist" at the local level because solid waste destined for in-state disposal must go to the in-state facility selected by the City. However, U & I and out-of-state companies are free to contract for the out-of-state delivery of waste generated in Columbus. If, however, a local collector like U & I is going to dump

the solid waste in-state, it must use the facility selected by the City. Like *Oehrleins*, since "out-of-state entities bear no such burden, there is little risk of inciting 'jealousies and retaliatory measures' from neighboring states." *Id.* at 1386 (quoting *Carbone*, 511 U.S. at 390). Therefore, absent compelling proof, we refuse to infer an improper purpose merely because the ordinance negatively affects one local trash hauler by protecting one in-state disposal facility at the expense of another in-state facility.

### c. Discrimination "In Its Effect"

The main argument advanced by U & I is that the ordinance "in its effect" discriminates against interstate commerce. The plaintiff's argument boils down to the following assertion:

The Commerce Clause is violated because the Butler County MRF will not receive solid waste from Columbus, as U & I cannot dispose of solid waste at the Butler County MRF, and thus the Butler County MRF cannot strip recyclables from that waste and sell those materials in interstate commerce.

We reject the plaintiff's argument. U & I wrongly "conflate[s] 'discrimination' with 'effect on commerce.' " *Oehrleins*, 115 F.3d at 1387.

Initially, there is no "direct" effect on interstate commerce involving recyclable material by virtue of the ordinance. U & I is free to haul the mixed solid waste to any out-of-state facility it wishes so that they can strip recyclable materials from the rest of the waste. Moreover, U & I can also require its customers to separate the recyclables from the solid waste. After that, U & I can separately haul those materials to the Butler County MRF (or to some other place) so that the processor can then sell the recovered plastics, paper, and metal in interstate commerce. Still further, U & I could haul the waste to the Butler County MRF, allow the Butler County MRF to strip the recyclables from the rest of the waste, and then haul the balance back to the transfer station in Columbus. The ordinance prohibits none of these activities.

Realizing that there is no "direct effect" on the interstate recyclable market, U & I argues that the "indirect effect" is enough to invalidate the ordinance. Essentially, U & I argues that the only cost-efficient method for U & I to participate in the recovery of recyclable materials is for U & I to do business with the Butler County MRF. The inability of U & I to haul waste to the Butler County MRF "indirectly affects" interstate commerce because the Butler County MRF will lose a source of supply for recyclable materials unless the plaintiff can do business at that in-state facility.

It is at this point we believe U & I wrongly "conflate[s] 'discrimination' with 'effect on commerce.' " *Id.* The ordinance "discriminates," but only against in-state facilities; that is, there is no " 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.' " *Id.* at 1383 (quoting *Oregon Waste Sys. Inc.*, 511 U.S. at 99).

One might speculate that the Columbus city ordinance reduces the flow of recyclable materials in interstate commerce because the Butler County MRF cannot count on Columbus waste as a source of supply from which recyclable materials could be stripped. Nevertheless, such a speculative impact does not amount to "discrimination" *against interstate commerce.* Rather, such conduct amounts to "discrimination" against the Butler County MRF. After all, the City's ordinance plainly permits interstate traffic in recyclable materials.

The fact that a local hauler, like the plaintiff, and a local disposal site, like the Butler County MRF, may be negatively influenced simply does not mean that the City of Columbus has "in effect" discriminated against interstate commerce. This conclusion is warranted because " '[n]egatively affecting interstate commerce is not the same as discriminating against interstate commerce.' " *Id.* at 1387 (quoting *Cotto Waxo Co.*, 46 F.3d at 794 (8th Cir.1995)).

For example, the State of Iowa would not be concerned that the Butler County MRF, located in Nebraska, lost a source of supply for recyclable waste. It is equally unlikely that the State of Iowa would be concerned

that a local Nebraska garbage collector must pay a higher "tipping fee" because of the ordinance.

Thus, the City's ordinance does not risk "inciting 'jealousies and retaliatory measures' from neighboring states." *Id.* at 1386 (quoting *Carbone*, 511 U.S. at 390). Therefore, whatever "indirect effect" the ordinance might have on interstate commerce is not enough to invalidate the ordinance as a per se violation of the Commerce Clause.

### 2. *Pike Balancing Test*

Having decided that the City's ordinance does not overtly discriminate against interstate commerce, we must next apply the *Pike* balancing test. We must decide whether " 'the burden imposed on ... commerce is clearly excessive in relation to the putative local benefits.' " *Id.* at 1383 (quoting *Pike*, 397 U.S. at 142.) After careful review, we find and conclude that the burden on interstate commerce is negligible, and any such burden is not clearly excessive when compared with the local benefits.

First, proof that ordinances like the one at issue impose *any* burden on interstate commerce is nonexistent. U & I has failed to show that ordinances like this one have a measurable impact on the national commerce in recyclables. For example, no evidence proved that there is, was, or will be a shortage of recyclables in the interstate market such that a reduction in the supply of recyclables to facilities like the Butler County MRF would have an impact on interstate commerce. Likewise, there was no showing that such ordinances have the tendency to increase the costs for recyclables in the interstate market. As a result, assuming some adverse impact upon interstate commerce would be highly speculative.

Second, if there is some burden on interstate commerce arising because of the enforcement of this ordinance, it is minuscule. The Butler County MRF has been and will continue to be a doubtful source of supply for recyclable materials whether or not the City enforces the ordinance.

We must remember that the Butler County MRF does not guarantee it will strip

recyclables from the waste stream. To the contrary, it retains the power to landfill the mixed solid waste as opposed to trying to remove recyclables from the waste. It makes this decision based upon what is in the best financial interests of the company. In fact, it has elected in the past to landfill materials rather than process them for recyclables.

Moreover, in 1997, the Butler County MRF generated only $121,000 in revenue from selling recyclable products, and it did not make a profit. This is true although the Butler County MRF had a surplus of solid waste from which recyclables may be separated.[12] Dan Costello, an expert in the field, confirmed that MRFs "very seldom" pay for themselves through the sale of recyclables. Even a principal of the Butler County MRF admitted that the venture would never make money from its recycling business. He testified that: "We will lose less money if we continue as we are doing today, but we think we can improve on those operations to a point where we will, at least, break even." (Tr. 179:10–12.)

In short, the Butler County MRF has been and will continue to be a shaky source of supply for the interstate market in recyclables. It is thus impossible to believe that the effect of the ordinance will adversely affect the interstate market.

Third, as noted earlier, the ordinance does not prohibit U & I from transporting mixed solid waste in interstate commerce so that recyclables can be removed. Nor does the ordinance prohibit U & I from starting a "curbside recycling program" and then disposing of those materials at the Butler County MRF or another place. Consequently, the ordinance's favorable facial treatment of interstate commerce sharply reduces any supposed indirect effect on the interstate market for recyclables.

Fourth, the local benefits of this ordinance are significant. The benefits outweigh any marginal impact upon interstate commerce. For example, by providing a dependable income stream, the ordinance allows the City of Columbus to control and operate a safe and secure landfill that complies with Nebraska law. While it is true that the City could use other licensed dump sites in Nebraska like the Butler County MRF, the City would give up control of the waste if it did so. As a result, the City would also forfeit the ability to manage for itself the substantial liability exposure that follows mixed solid waste. Maintaining control over liability risks associated with mixed solid waste is both reasonable and beneficial for the City.

Furthermore, the ordinance fosters the collection of "tipping fees" that fund other worthwhile programs. For example, the fees generated by the ordinance fund the City's recycling center. Still further, the fees support the yard waste composting program. These two programs have diverted approximately 3,721 tons from the landfill in the 1996–1997 fiscal year.

Lastly, U & I argues that the City's choice of how to comply with Nebraska law is wrong; that is, U & I argues that the City could achieve better compliance with ISWMA if it allowed U & I to patronize the Butler County MRF. We reject this argument because it is not the role of this court to judge how the City can best comply with Nebraska law.

This court's limited role is to judge whether the *Pike* balancing test requires a finding that the Commerce Clause has been violated. Since the benefits to the City resulting from enforcement of the ordinance are real (not illusory) and the burdens on interstate commerce are nonexistent or minuscule, deciding how best to comply with state law is both unnecessary and unwise. It is enough to conclude, as we do, that " 'the burden imposed on ... commerce is [not] clearly excessive in relation to the putative local benefits.' " *Oehrleins,* 115 F.3d at 1387 (quoting *Pike,* 397 U.S. at 142.)

### IV. CONCLUSION

We find and conclude that the actions of the City of Columbus did not overtly discriminate against interstate commerce. We also find and conclude that the burdens, if any,

---

**12.** The facility receives about 150 to 200 tons per day in waste, and processes only 55 to 65 tons per day. In the future, it may have the capacity to process 80 to 100 tons.

imposed upon commerce are not clearly excessive compared to the local benefits that flow from the actions of the City of Columbus.

Accordingly,

IT IS ORDERED that judgment in favor of the defendant will be entered by separate document, providing that the plaintiff will take nothing against the defendant, this case is dismissed with prejudice, and costs are taxed to the plaintiff.