# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 98-1893

_____

U & I Sanitation,

    Plaintiff - Appellant,

v.

City of Columbus,

    Defendant - Appellee.

\*
\*
\*
\*  Appeal from the United States
\*  District Court for the
\*  District of Nebraska.
\*
\*
\*

_____

Submitted:  February 12, 1999

Filed:  February 22, 2000

_____

Before MURPHY, LAY, and JOHN R. GIBSON, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

U & I Sanitation initiated this suit under 42 U.S.C. § 1983, seeking an injunction against a Columbus, Nebraska, ordinance requiring that all garbage collected within the city limits, except garbage destined for out-of-state disposal, be processed at the city-owned transfer station. The district court conducted a bench trial and held that the ordinance does not violate the dormant Commerce Clause. See U & I Sanitation v. City of Columbus, 998 F. Supp. 1092 (D. Neb. 1998). U & I appeals, and we now reverse.

The facts underlying U & I's claim are not disputed.   U & I is one of several private haulers that picks up garbage in Columbus, a city of about 20,000 residents located in eastern Nebraska.  In response to various obligations imposed by state law, the City entered into a coalition in 1996 with other nearby municipalities to construct and operate a common landfill.  Garbage collected in Columbus by private haulers is "processed" at the city's transfer station before it is sent to the common landfill.  This processing consists of looking at each load that is dumped and removing any hazardous materials from the solid waste that is destined for the coalition landfill.  No other items are removed, however, and there is no sorting of recyclables.  All of the solid waste brought to the transfer station is taken to the landfill for burying.

In order to fund its share of expenses stemming from the coalition landfill as well as various other aspects of its garbage disposal system (including a drop-off recycling center, a yard waste composting program, a wood waste disposal site, and the transfer station itself), the City charges haulers a "tipping fee" of $49 per ton for garbage that is dumped at its transfer station.  This tipping fee is used primarily to reduce the City's obligation on the bond that was issued to build and develop the landfill.

U & I discovered that it could dispose of waste more economically by bypassing the Columbus transfer station.  The Butler County Landfill, Inc., a facility less than 30 miles from the City,[1] charged U & I a tipping fee of only $23.25 per ton, so U & I began taking the solid waste it collected to the Butler County facility in June 1997.  U & I collects some 20 percent of the solid waste generated in Columbus, and City

---

[1]While the record contains no clear statement of the distance, we note that a Rand McNally Road Atlas measures 24 miles between Columbus and David City, where the Butler County facility is located.  This observation is consistent with the testimony of Tim Cech, one of the owner-operators of U & I, who testified that a round trip to unload a garbage truck took approximately 90 minutes.

officials noticed a corresponding reduction in revenues generated by the transfer station.

The City became concerned about U & I's diversion of solid waste from the coalition landfill. Only after it learned that it was collecting less in tipping fees at the transfer station because U & I was using the Butler County facility, the City enacted the following ordinance in August 1997 to protect Columbus's investment in its waste management program:

> It shall be unlawful, except as set forth herein, to unload or deposit any garbage, refuse, yard waste and the contents of privy vaults and cesspools hauled from any premises within the corporate limits of the City, and destined for disposal within the State of Nebraska, at any place other than the approved disposal site designated by the Mayor and Council.

Ordinance No. 97-21, amending Columbus City Code, § 8-2-7-(a), Chapter 2, Garbage and Refuse. The "approved disposal site designated by the Mayor and Council" is, of course, the city-owned transfer station. The ordinance therefore requires that solid waste collected within the city be deposited at the local transfer station, unless the waste is to be sent out-of-state.

Following passage of the ordinance, U & I continued to haul solid waste collected in Columbus to the Butler County facility. Concomitantly, the City continued to experience a 20 percent reduction in the transfer station's revenues. Primarily concerned that it would be unable to meet its financial obligations relating to the coalition landfill, the City passed a resolution to suspend U & I's hauler's license. Although the City voiced concern that U & I's ability to bypass the transfer station might increase the City's liability for hazardous waste accidents, the record presents no evidence of any health or safety risk associated with U & I taking its solid waste to Butler County rather than the City's transfer station, and the undisputed evidence

shows that the Butler County facility is in compliance with all relevant state and federal environmental standards.

In addition to charging less than Columbus's facility, the Butler County facility offers a more comprehensive recycling program. The Butler County Landfill, Inc. operates one of the state's three "Material Recovery Facilities," which remove recyclable materials from solid waste. In such facilities, solid waste is placed onto a conveyor belt, and employees working alongside the conveyor belt remove the recyclable materials by hand. After materials such as glass, plastic, metal and various paper products are removed from the solid waste, they are sold to processors and manufacturers in Nebraska and other states, thus entering the stream of interstate commerce. Because of its Material Recovery Facility, the Butler County Landfill, Inc. is able to remove and market 16 percent by weight (or 28 percent by volume) of the solid waste that it receives. The Nebraska Department of Environmental Quality maintains oversight of the Material Recovery Facilities, including granting permits and inspecting the facilities. Only facilities that have been granted permits are allowed to separate recyclable from non-recyclable solid waste.

By contrast, the City of Columbus operates a voluntary "community-based" recycling program, in which individual citizens may themselves separate recyclable materials from the rest of the garbage they generate, and then take such materials to a city facility. Through this means, the City reduces the amount of waste that it would otherwise send to the coalition landfill by only about 2 to 3 percent. The difference between 16 percent and 2 to 3 percent represents the impact of the City's ordinance upon interstate commerce; rather than being sold, reprocessed, and sold again, the residual recyclable materials sit under six inches of dirt at the coalition landfill.

Other than taking the garbage it collects to the Butler County facility, U & I has no practicable means of sending its recyclable materials into the stream of interstate commerce. The City (and the district court) have suggested several alternatives, but

the undisputed record shows that each of these alternatives offers only economic suicide to U & I. These alternatives include transporting the waste it collects to a facility in another state; taking its garbage to the Butler County facility, having the recyclable materials removed, and transporting the rest of the waste to the Columbus transfer station; removing the recyclable materials itself before taking the remainder of the garbage to the local transfer station; initiating its own curbside recycling program; or constructing its own Material Recovery Facility.

Faced with a one-year suspension of its license, U & I brought this action in the district court, alleging (among other things) that the City's ordinance violated the dormant Commerce Clause. U & I sought a temporary restraining order, which the district court denied, conditioned upon the City's agreement not to enforce U & I's license suspension and U & I's agreement to comply with the ordinance pending litigation of the underlying constitutional claim.

The district court consolidated a trial on the merits with U & I's motion for a preliminary injunction, and it ultimately denied U & I's claim. In so doing, the court first held that the ordinance did not "overtly" discriminate against interstate commerce on its face, in its purpose, or in its effects. Second, the court held that the burden imposed by the ordinance upon interstate commerce was not "clearly excessive in relation to the putative local benefits." See Pike v. Bruce Church, Inc., 397 U.S. 137, 142 (1970). Specifically, the district court found the local economic benefits of the ordinance to be "significant," 998 F. Supp. at 1104, while it deemed the burdens on interstate commerce "nonexistent or minuscule." Id. The court entered judgment in the City's favor, and this appeal followed.

**I.**

When a state or local regulation is alleged to violate the dormant Commerce Clause, we use either of two frameworks to evaluate the claim. First, if the law in

question overtly discriminates against interstate commerce, then we will strike the law unless the state or locality can demonstrate, "under rigorous scrutiny, that it has no other means to advance a legitimate local interest." C & A Carbone, Inc. v. Town of Clarkstown, 511 U.S. 383, 392 (1994). The discrimination may take one of three forms. The law may be discriminatory on its face or, even if it is facially neutral, the law may have a discriminatory purpose or a discriminatory effect. See SDDS, Inc. v. South Dakota, 47 F.3d 263, 267 (8th Cir. 1995). For purposes of the dormant Commerce Clause, "discrimination" means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." Oregon Waste Sys., Inc. v. Department of Envtl. Quality, 511 U.S. 93, 99 (1994).

Second, even if a law does not overtly discriminate against interstate commerce, the law will nonetheless be stricken if the burden it imposes upon interstate commerce is "clearly excessive in relation to the putative local benefits." Pike, 397 U.S. at 142. The balancing test is less rigorous for a law that does not overtly discriminate. See Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin County, 115 F.3d 1372, 1383 (8th Cir. 1997).

To be sure, the distinction between laws that overtly discriminate against interstate commerce and laws that place impermissible burdens upon interstate commerce is an elusive one.[2] See Brown-Forman Distillers Corp. v. New York State

---

[2]U & I predicates its constitutional claim upon the ordinance's effects, that is, the ordinance prevents U & I from placing into interstate commerce the recyclable materials within the garbage that U & I collects in Columbus. U & I does not appear to argue that the ordinance facially discriminates against interstate commerce, for the ordinance explicitly exempts from its reach garbage that is destined for out-of-state disposal. Further, U & I argues only indirectly that the ordinance purposefully discriminates against interstate commerce, alleging that the City's motive to raise revenue through its transfer station amounts to "economic protectionism." That is indeed so, since the City requires that garbage be deposited at its transfer station and

Liquor Auth., 476 U.S. 573, 579 (1986) ("[T]here is no clear line separating the category of state regulation that is virtually per se invalid under the Commerce Clause, and the category subject to the Pike v. Bruce Church balancing approach."). We are able to make that distinction in this case, however, following the directives in Carbone and Oehrleins. We conclude that the ordinance does not overtly discriminate against interstate commerce, but that it does not withstand constitutional scrutiny under the Pike balancing test.

## A.

If the ordinance overtly discriminates against interstate commerce on its face or through its purpose or effects, then its constitutionality is dubious and the City faces a heavy burden of proof. The ordinance is presumed invalid unless the City can demonstrate that the ordinance serves some legitimate purpose unrelated to limiting interstate commerce and that the ordinance is the only possible way to achieve this purpose. See Carbone, 511 U.S. at 392; Wyoming v. Oklahoma, 502 U.S. 437, 454-56 (1992).

The ordinance requires haulers to bring waste collected within the City to its transfer station only if that waste is to be disposed of within the state. It is therefore

---

not at other facilities. Nevertheless, this fact does not demonstrate a motive to discriminate against out-of-state interests, who remain free to process Columbus waste should a hauler wish to transport it across state lines. The ordinance before us is therefore "local protectionism," but its constitutionality will be governed by its effects upon interstate, not local, commerce. See Oehrleins, 115 F.3d at 1385 (concerning similar ordinance as applied only to waste delivered in-state, the court stated: "The only preference granted to the designated facilities is with respect to other local operators. This may create a monopoly at the local level, but as long as waste is allowed to flow freely in or out of the state, this does not constitute discrimination against interstate commerce.").

a different species than the ordinance at issue in <u>Carbone</u>, where the city required that all of its solid waste be deposited at its transfer station.  <u>See</u> 511 U.S. at 387.

The Columbus ordinance is comparable to the enforced portion of the county ordinance we considered in <u>Oehrleins</u>.  In that case, Hennepin County, Minnesota enacted an ordinance requiring waste to be delivered only to county-designated transfer stations or processing facilities, in an effort to assure that sufficient quantities of waste would be delivered to an incinerator whose construction was financed by county-issued bonds.  The County later ceased enforcement of the ordinance against haulers who delivered waste to facilities outside the state, but continued to enforce it with respect to intrastate deliveries to non-designated local facilities.  <u>See</u> 115 F.3d at 1377-78.  We agreed with plaintiffs that the County maintained a monopoly on waste that stays in-state, but we concluded that there was no overt discrimination against interstate commerce because no local processors were treated preferentially with respect to out-of-state facilities.  <u>See</u> <u>id</u>. at 1385.  Because the district court had incorrectly analyzed the case under <u>Carbone</u>, we remanded so that the court could appropriately determine the outcome under the <u>Pike</u> test.

The purely intrastate designation of the Columbus ordinance, which does not explicitly favor a local interest over out-of-state interests, does not overtly violate the Commerce Clause.  Our inquiry does not end here, however.  We must next apply the appropriate balancing test set forth in <u>Pike</u>.

**B.**

Although Columbus's ordinance does not overtly discriminate against interstate commerce on its face, in its purpose, or through its effects, the ordinance may still violate the dormant Commerce Clause if the local interests that it serves do not justify the burden that it imposes upon interstate commerce:

> Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.

Pike, 397 U.S. at 142.

Two important considerations affect our comparison of the ordinance's relevant burdens and benefits. First, in assessing the extent to which a state or local law incidentally burdens interstate commerce, our analysis is not limited to the burdens suffered by the particular parties before us. Rather, we must adopt an aggregate analysis whereby we consider the interstate effect on the recyclables market if several jurisdictions were to adopt similar ordinances. "[T]he practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation."[3] Healy v. Beer Inst., 491 U.S. 324, 336

---

[3]Our attention to aggregate analysis is not contrary to the Commerce Clause holding in United Waste Systems of Iowa, Inc. v. Wilson, 189 F.3d 762 (8th Cir. 1999). The discussion of the analytical framework for Commerce Clause challenges in United Waste Systems includes dicta concerning "cumulative effects" cases. Id. at 765-66. The parties did not argue in favor of or against using a cumulative effects test, and it played no role in the analysis of plaintiffs' Commerce Clause challenge.

In United Waste Systems, we rejected a Commerce Clause challenge to an Iowa regulation that required each city and county to designate a single disposal facility for any waste that was to be disposed of within the state. The plaintiff landfill alleged that the regulation caused it to lose business, and that it was precluded from purchasing additional fuel, equipment and supplies from out-of-state businesses because it had not been chosen by a sufficient number of counties as a designated disposal site. We concluded, based on the record, that the alleged business loss resulted from poor marketing techniques and not from the state regulation. 189 F.3d at 766-67 & n.3. Indeed, we found the argument "barely believable." Id. at 766.

(1989), quoted in Carbone, 511 U.S. at 406 (O'Connor, J., concurring) and Wyoming, 502 U.S. at 453-54. The district court did not apply this analysis, but rather found that U & I "failed to show that ordinances like this one have a measurable impact on the national commerce in recyclables." 998 F. Supp. at 1103 (emphasis added). Nevertheless, the district court's findings of fact include numerous findings relevant to aggregate analysis. The court found that 16 percent of U & I's solid waste loads could be recycled if taken to the Butler County facility, and that the parties had agreed that such recyclables entered the stream of interstate commerce by going into recyclable markets throughout the country. See id. at 1099. The court recited evidence offered by three companies that purchase recyclable products from Butler County, all of which sell the items in several states. See id. The district court made the factual findings necessary to analyze the effect on interstate commerce if a number of communities enacted "ordinances like this one."

A second consideration affects our comparison of burdens and benefits. When a law that burdens interstate commerce serves some legitimate local purpose, the availability of a less burdensome alternative is relevant to the inquiry that Pike requires. See Pike, 397 U.S. at 142 ("[T]he extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.").

The City directs our attention to two purposes served by the ordinance. First, the ordinance ensures the economic viability of the City's waste disposal program, most importantly because the guaranteed source of tipping fees provides a means to pay off the debts incurred through the City's involvement in the coalition landfill. The tipping fees also fund waste disposal projects that the City undertook at least in part to comply with state legislation, such as a "community-based" recycling program and

facilities to process yard and wood waste.[4]  Second, the City argues that the ordinance limits its potential tort liability because it prevents the leakage or misplacement of hazardous waste materials.

While it is apparent that both of these purposes are legitimate, we must determine "the nature of the local interest."  Pike, 397 U.S. at 142.  The City's first stated purpose is simply an economic one.  The City wishes to finance its debt on the coalition landfill by having a predictable stream of income from the tipping fees that the ordinance generates.  The City's desire to capture these tipping fees cannot salvage the ordinance, for "[b]y itself . . . revenue generation is not a local interest that can justify discrimination against interstate commerce."  Carbone, 511 U.S. at 393.  We recognize that the ordinance's revenue-generating goal may reflect a legitimate local purpose, but it is not a persuasive or overriding basis for its validity.  See id. at 405-06 (O'Connor, J., concurring) (evaluating ordinance under Pike balancing test and rejecting argument that town's need to ensure financial viability of transfer station justified ordinance's effects upon interstate commerce, where town could raise revenue through other means); Burlington N. R.R. Co. v. Nebraska, 802 F.2d 994, 1001 (8th Cir. 1986) (describing Justice Blackmun's concurrence in Raymond Motor Transp., Inc. v. Rice, 434 U.S. 429, 448-49 (1978) as follows:  "He stressed, however, that the balance is struck differently [i.e., in the state's favor] when the state legitimately seeks to further a public safety objective than when merely economic interests are at stake.").[5]

_____

[4]Under the Integrated Solid Waste Management Act, Neb. Rev. Stat. §§ 13-2001 - 13-2043 (Reissue 1997), municipalities are required to "provide or contract for . . . the safe and sanitary disposal of solid waste generated within" city limits, and are encouraged (i) to eschew smaller and numerous landfills in favor of larger facilities and (ii) to coordinate with other cities and political subdivisions to provide and finance solid waste management facilities.  See Neb. Rev. Stat. §§ 13-2002(3),  (6), 13-2020 (Reissue 1997).

[5]We have no occasion to decide whether a local regulation's revenue-generating purpose, without more, could ever justify significant incidental burdens upon interstate

The City's second stated purpose is not advanced by the enactment of this ordinance, thereby making illusory any benefit to be achieved by it. It is sheer speculation to suppose that the ordinance has any effect upon the risk of hazardous waste accidents. The record is devoid of any such evidence. To the contrary, it shows that the Butler County facility complies with all federal and state environmental standards, and the official who directs the City's waste management program testified that the ordinance's enforcement stems from the prospect of lost revenues rather than from any concern for public health or welfare.[6] Moreover, even if the City could prove that the ordinance actually limits the potential liabilities associated with hazardous waste, in that other facilities might not "process" Columbus waste as carefully as does the Columbus transfer station, this fact would not save the ordinance either. See Carbone, 511 U.S. at 393 ("Nor may Clarkstown justify the flow control ordinance as a way to steer solid waste away from out-of-town disposal sites that it might deem harmful to the environment. To do so would extend the town's police power beyond its jurisdictional bounds.").

_____

commerce under the Pike balancing approach. Cf. Carbone, 511 U.S. at 393 ("By itself, of course, revenue generation is not a local interest that can justify discrimination against interstate commerce."). The permissibility of state and local taxation measures, of course, is governed by a different framework. A state or local tax is to be sustained against a Commerce Clause challenge "when the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." Oklahoma Tax Comm'n v. Jefferson Lines, Inc., 514 U.S. 175, 183 (1995) (internal quotations omitted).

[6]Indeed, the record contains unrefuted evidence that while the ordinance was enacted in response to the diversion of waste from the transfer station, such diversion raised absolutely no public health or safety concerns. Cf. Burlington Northern, 802 F.2d at 999 (state regulations enacted to promote public health and safety are accorded particular deference).

As Pike directs, our analysis of "the nature of the local interest" must be paired with an examination of the record for available alternatives. See 397 U.S. at 142. The record shows that the City has available to it other less burdensome means to achieve its stated purposes. The City can raise revenue and protect its investment in the coalition landfill through general taxation. We recognize that such an alternative has political implications. If those implications are overwhelming and the City insists upon having a self-financing waste management system, it might levy higher licensing fees against U & I and the seven other private haulers who are currently licensed to pick up waste in Columbus. If the City wishes to limit its liability for potential hazardous waste accidents, it might enact uniform safety regulations governing the handling and disposal of waste, see Carbone, 511 U.S. at 393, or it might require haulers who collect garbage in Columbus to certify that their methods comply with all relevant state and federal environmental standards.

The City presents several factual arguments to the effect that its ordinance does not substantially interfere with interstate commerce. First, it argues that the Butler County facility accepts some 150 to 200 tons of garbage per day but can only send fifty-five to sixty tons through its Material Recovery Facility. Because the garbage received by the Butler County facility is fungible, the City argues that the facility's loss of U & I's business will not decrease the total amount of garbage sent through the Butler County Material Recovery Facility and therefore will not decrease the total amount of recyclable materials sent to interstate markets. Second, the City argues that the Butler County facility makes no assurance to any particular trash hauler that its trash will be sent through the Material Recovery Facility rather than straight to a landfill. Third, the Butler County facility permits U & I to deliver its garbage there at below-market prices, and its Material Recovery Facility loses money and provides an unstable market in recyclable materials.

We reject all of these arguments because they are too limited in their scope. They account only for the particular ordinance at issue and its effects upon the

-13-

particular parties before us. When evaluating the ordinance's impact upon interstate commerce, we must ascertain "what effect would arise if not one, but many or every, [jurisdiction] adopted similar legislation." Healy, 491 U.S. at 336. That the Butler County facility has an overabundance of garbage brought to it each day is not dispositive, for it and other facilities like it would have no such abundance if ordinances such as the City's were universally enacted and enforced.

We conclude that the ordinance's effects upon interstate commerce are far from trivial. Assuming, as we must, that all cities such as Columbus enacted flow control ordinances like the one at issue here, the interstate market in recyclable materials extracted from solid waste could be substantially diminished or impaired, if not crippled. This is no academic problem, for:

> Over 20 States have enacted statutes authorizing local governments to adopt flow control laws. If the localities in these States impose the type of restriction on the movement of waste that Clarkstown has adopted, the free movement of solid waste in the stream of commerce will be severely impaired. Indeed, pervasive flow control would result in the type of balkanization the [Commerce] Clause is primarily intended to prevent.

Carbone, 511 U.S. at 406 (O'Connor, J., concurring) (footnote omitted). For example, in Nebraska there are only three Material Recovery Facilities such as the one at the Butler County facility.[7] If every city enacted local processing requirements and effectively decreed that locally generated waste must be deposited at favored local

---

[7]Although we earlier likened the Columbus ordinance to the enforced portion of the ordinance at issue in Oehrleins, see supra Part I.A., the affected interstate markets are quite different. In Oehrleins, we considered the effect of a flow control ordinance on the market for waste processing only. Here, we are confronted with the effect of such an ordinance on the interstate market for recyclable products. As the record shows, such a market not only exists, but its continued vitality is threatened by ordinances that would deprive Nebraska's Material Recovery Facilities of a source of recyclable materials.

facilities offering virtually no recycling capabilities, the market in reusable metal, glass, plastic, and paper materials that are removed from solid waste, sold, reprocessed, and sold again could substantially diminish. Considering this threat and the attenuated local benefits urged in the ordinance's defense, we conclude that the ordinance's interference with interstate commerce is "clearly excessive" in relation to those benefits.

## II.

If states and cities wish to enact laws that threaten to substantially restrict or eliminate a particular interstate market, they must advance weightier justifications than those advanced today by the City of Columbus. The judgment of the district court is reversed, and the case is remanded for entry of appropriate injunctive relief.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-15-